**Jerry CHARLES, Plaintiff,**

v.

**Dick VERHAGEN and Jon Litscher, Defendants,**

**and**

**United States of America, Intervenor.**

**No. 01–C–253–C.**

United States District Court, W.D. Wisconsin.

Aug. 28, 2002.

Jerry Charles, Oshkosh, WI, Pro se.

Jody J. Schmelzer, Assistant Attorney General, Madison, WI, for Jon Litscher, Dick Verhagen.

Joshua Z. Rabinovitz, U.S. Department of Justice, Civil Division, Washington, DC, for U.S.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for declaratory, injunctive and monetary relief brought pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc–2000cc–5. Plaintiff Jerry Charles is a Wisconsin prisoner and practicing Muslim presently confined at the Oshkosh Correctional Institu-

tion in Oshkosh, Wisconsin. He contends that defendants' enforcement of a prison Internal Management Procedure restricting his access to Islamic prayer oil and preventing him from celebrating more than one annual religious feast violates his rights under both the free exercise clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act.

In an order entered on April 15, 2002, I granted defendants' summary judgment motion on all of plaintiff's claims except his claim that his rights under the Religious Land Use and Institutionalized Persons Act were violated when he was not allowed to possess prayer oil in his cell. As to that claim, I concluded that, as applied to plaintiff to prevent him from possessing prayer oil in his cell, the prison's religious property Internal Management Procedure violates the Religious Land Use and Institutionalized Persons Act because it does not represent the approach to controlling administrative costs and preserving prison resources that is least restrictive of plaintiff's exercise of his religion. However, I determined that although plaintiff might be entitled to declaratory or injunctive relief, he would not be entitled to monetary relief on his surviving claim because defendants are immune from money damages on that claim.

In addition, in that same order, I noted that plaintiff could not yet declare victory because defendants had challenged the act's constitutionality. Pursuant to 28 U.S.C. § 2403, I was required to certify to the Attorney General of the United States the fact that defendants had drawn into question the act's constitutionality and give the United States an opportunity to intervene on that question. The United States and the parties have now fully briefed the only question remaining in this case: whether the relevant section of the Reli-

gious Land Use and Institutionalized Persons Act is constitutional. In the April 15 order, I informed the parties that once I had considered the question of the act's constitutionality, I would either grant defendants' summary judgment motion as to plaintiff's remaining claim because the act violates the Constitution or, if the act survived constitutional scrutiny, I would enter summary judgment for plaintiff on that claim on the court's own motion. *See Borcherding–Dittloff v. Corporate Receivables, Inc.*, 59 F.Supp.2d 822, 826 (W.D.Wis. 1999); *see also* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* 3d § 2720 at 347 (1998) (summary judgment may be entered in favor of non-moving party even though no formal cross-motion has been filed). Because I find that the Religious Land Use and Institutionalized Persons Act is a constitutionally valid exercise of Congress's spending power, does not violate the Tenth Amendment to the Constitution and does not violate the First Amendment's establishment clause, I will enter summary judgment in favor of plaintiff on his remaining claim.

Most of the material undisputed facts in this case were detailed in the court's April 15, 2002 order. However, for the purpose of deciding defendants' constitutional challenge, I find the following additional facts to be material and undisputed.

## ADDITIONAL UNDISPUTED FACTS

Defendant Dick Verhagen is the former administrator of the Wisconsin Department of Corrections Division of Adult Institutions. Defendant Jon Litscher is Secretary of the Department of Corrections. Typically, the Wisconsin Department of Corrections accepts federal funds in the following general areas: education; alcohol, drug and mental health programs; prison construction; communication and technology systems; work training programs; and miscellaneous areas such as sex offender treatment and community and victim programs. In fiscal year 2001, the Department of Corrections accepted over $14.5 million in federal financial assistance, with the funds distributed according to the following approximate breakdown: $2,523,000 for education; $3,207,275 for alcohol, drug and mental health programs; $4,967,000 for prison construction; $1,813,000 for communications and technology systems; $997,873 for work training programs; and $999,096 for miscellaneous projects. In fiscal year 2001, federal funds accounted for approximately 1.6% of the department's total expenditures. The department receives no federal funds for religious programing.

## OPINION

Section three of the Religious Land Use and Institutionalized Persons Act prohibits governmental imposition of a "substantial burden on the religious exercise" of a prisoner, even if the burden results from a rule of general applicability, unless the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a). Invoking its powers under the Constitution's spending and commerce clauses, Congress made section three applicable

> in any case in which—
>
> (1) the substantial burden is imposed in a program or activity that receives Federal financial assistance; or
>
> (2) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes.

*Id.* at § 2000cc–1(b). Events leading up to congressional passage of the act are described in the court's April 15, 2002 order, dkt. # 63, at 11–13. Defendants challenge

only the constitutionality of section three of the act, which contains the provisions relating to institutionalized persons. They maintain that in approving the act, Congress exceeded its authority under both the spending clause and the commerce clause. Defendants argue also that the act violates both the Tenth Amendment and the First Amendment's establishment clause.

### A. *Spending Clause*

 The Constitution grants Congress the power to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the Common Defence and general Welfare of the United States." U.S. Const. Art. I, § 8, cl. 1. Congress's spending power is broad and "is not limited by the direct grants of legislative power found in the Constitution." *United States v. Butler*, 297 U.S. 1, 66, 56 S.Ct. 312, 80 L.Ed. 477 (1936). In other words, Congress may tax and spend to enhance the national welfare generally, not merely to carry out the specific powers assigned to it in Article I of the Constitution. Incident to its spending power, "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (opinion of Burger, C.J.)). As the leading case on conditional spending, *Dole* sets restrictions on the ability of Congress to condition the grant of federal funds on the recipients' compliance with federal policy objectives.

*Dole* involved a federal law that directed the Secretary of Transportation to withhold a percentage of federal highway funds from states that permitted persons under the age of 21 to purchase alcohol. The Court held that Congress's decision to condition federal aid on a state's agreement to impose a mandatory drinking age was "within constitutional bounds even if Congress may not regulate drinking ages directly." *Id.* In the course of reaching its decision, the Court identified four limitations on Congress's spending power.

> The first of these limitations is derived from the language of the Constitution itself: the exercise of the spending power must be in pursuit of "the general welfare." ... Second, we have required that if Congress desires to condition the States' receipt of federal funds, it "must do so unambiguously ..., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation." Third, our cases have suggested (without significant elaboration) that conditions on federal grants might be illegitimate if they are unrelated "to the federal interest in particular national projects or programs." Finally, we have noted that other constitutional provisions may provide an independent bar to the conditional grant of federal funds.

*Id.* at 207–08, 107 S.Ct. 2793 (internal citations and footnote omitted). On top of these specific limitations, the Court has suggested a general requirement that conditional spending programs must be more in the nature of a carrot than a stick. Therefore, conditions may be unconstitutional when they cross the line between permissible encouragement and impermissible coercion. *Id.* at 211, 107 S.Ct. 2793.

### 1. *The general welfare*

 The first limitation on Congress's spending power is that federal funds must be appropriated and disbursed with an eye toward advancing the general welfare. "In considering whether a particular expenditure is intended to serve general pub-

lic purposes, courts should defer substantially to the judgment of Congress." *Id.* at 207. The Supreme Court has held that congressional determinations on this score cannot be questioned "unless the choice is clearly wrong, a display of arbitrary power, [or] not an exercise of judgment." *Helvering v. Davis,* 301 U.S. 619, 640, 301 U.S. 672, 57 S.Ct. 904, 81 L.Ed. 1307 (1937); *see also Buckley v. Valeo,* 424 U.S. 1, 91, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("It is for Congress to decide which expenditures will promote the general welfare . . . [and][w]hether the chosen means appear 'bad,' 'unwise,' or 'unworkable' to us is irrelevant."). Indeed, "[t]he level of deference to the congressional decision is such that the Court has more recently questioned whether 'general welfare' is a judicially enforceable restriction at all." *Dole,* 483 U.S. at 207 n. 2, 107 S.Ct. 2793; *see also* Rebecca E. Zietlow, *Federalism's Paradox: The Spending Power and Waiver of Sovereign Immunity,* 37 Wake Forest L.Rev. 141, 171 (2002) ("Congress's ability to spend for 'the general welfare' is currently limited only by its own definition of [that] phrase.").

■ Defendants put little effort into arguing that Congress was not legislating for the general welfare when it conditioned federal financial aid to prison programs or activities on a state's willingness to avoid substantially burdening the religious exercise of prisoners. The legislative record documenting the act's passage indicates that its supporters sought to strike a "balance between respecting the compelling interests of government and protecting the ability of people freely to exercise their religion." 146 Cong. Rec. S7778 (daily ed. July 27, 2000) (statement of Sen. Kennedy). Given the enormous degree of deference such congressional determinations are due, I conclude that in enacting section three of the Religious Land Use and Institutionalized Persons Act, Congress was acting to further the general welfare.

## 2. *Unambiguously imposed conditions*

■ The second requirement on conditional grants of federal funding is that the conditions be imposed unambiguously. The Supreme Court has noted that "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State School v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (citations omitted). Section three of the Religious Land Use and Institutionalized Persons Act provides explicitly that "[n]o government shall impose a substantial burden on the religious exercise of a person . . . confined to an institution" unless the burden is imposed "in furtherance of a compelling government interest" and "is the least restrictive means" of furthering that interest. 42 U.S.C. § 2000cc–1(a). The act makes clear that these requirements apply to any "program or activity that receives federal financial assistance," *id.* at § 2000cc–1(b)(1), and that a private right of action exists under the act allowing a person to "obtain appropriate relief against a government." *Id.* at § 2000cc 2(a). Defendants argue that the "least restrictive means" standard incorporated in the act is too ambiguous to put states on notice as to the conditions they are required to satisfy in exchange for accepting federal funds. Indeed, defendants contend that in *Pennhurst,* the Supreme Court held that "Spending Clause legislation requiring states to perform their functions in a 'least restrictive' manner is too indefinite to be a valid exercise of that power." Dfts.' Br. in Supp. of Mot. for Summ. J., dkt. # 41, at 16. In response, intervenor United States

argues that defendants have misread *Pennhurst.* I agree.

In *Pennhurst,* the Court considered a federal statute that allocated funds to states in order to assist them in improving care for the developmentally disabled. One section of the statute contained a "bill of rights" containing various congressional "findings," including one to the effect that "[p]ersons with developmental disabilities have a right to appropriate treatment ... in the setting that is least restrictive of the person's personal liberty." *Pennhurst,* 451 U.S. at 13, 101 S.Ct. 1531. The Court considered whether "Congress, acting pursuant to its spending power, conditioned the grant of federal money on the State's agreeing to" provide developmentally disabled persons with appropriate treatment in the least restrictive setting. *Id.* at 22, 101 S.Ct. 1531. It found the suggestion that Congress had imposed such a condition "wholly without merit" and that "Congress made clear that the provisions of [the 'bill of rights'] were intended to be hortatory, not mandatory." *Id.* at 22, 24, 101 S.Ct. 1531.

In passing, the Court noted also that "[it] is difficult to know what is meant by providing 'appropriate treatment' in the 'least restrictive' setting, and it is unlikely that a state would have accepted federal funds had it known it would be bound to provide such treatment." *Id.* at 25, 101 S.Ct. 1531. From this statement, defendants leap to the conclusion that *"Pennhurst* expressly held that Spending Clause legislation requiring states to perform their functions in a 'least restrictive' manner is too indefinite to be a valid exercise of that power." Dfts.' Reply Br. in Supp. of Mot. for Summ. J., dkt. # 74, at 2. *Pennhurst* held no such thing. Instead, the Court held that "Congress fell well short of providing clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to *com-*

*ply* with" the bill of rights' provisions. *Pennhurst,* 451 U.S. at 25, 101 S.Ct. 1531 (emphasis added). The Court did not hold that the "least restrictive" standard was too vague to constitute a permissible condition for spending clause purposes. Rather, it held that the states had not been put on notice that compliance with that standard was a condition of accepting federal funds. *Id.* at 27, 101 S.Ct. 1531 ("In sum, the court below failed to recognize the well-settled distinction between congressional 'encouragement' of state programs and the imposition of binding obligations on the States."); *see also* Laurence H. Tribe, *American Constitutional Law* § 5–6, at 838 n. 23 (3d ed.2000) (noting unambiguous conditions requirement "is an application of a fairly standard clear statement rule of statutory construction"). In other words, the Court did not hold that the act's bill of rights "conditions" were too vague to withstand constitutional scrutiny. To the contrary, the Court held that the bill of rights provisions were not conditions at all.

Moreover, rather than ruling out the use of a "least restrictive" standard, the language of *Pennhurst* suggests that such a standard is permissible for purposes of spending clause legislation. In determining that the disability statute's bill of rights provisions were not mandatory conditions, the Court noted that "Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds. *That canon applies with greatest force where, as here, a State's potential obligations under the Act are largely indeterminate"* because of the difficulty states face in ascertaining what is "appropriate treatment" in the "least restrictive" setting. *Id.* at 24–25, 101 S.Ct. 1531 (emphasis added). In reaching the conclusion that it is most critical for Congress to give

clear expression to its intent to condition federal aid when imposing indeterminate standards on the states, the Court necessarily implies that the imposition of such standards is permissible.

· Defendants argue that the Religious Land Use and Institutionalized Persons Act's "least restrictive means" test is too ambiguous because Department of Corrections administrators would be "subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). But the protection that *Pennhurst* provides potential federal aid recipients is fair warning that Congress is conditioning a grant of such aid on a state's willingness to accept a somewhat ambiguous standard. States may then decide whether to accept the federal funds at the price of subjecting themselves to a degree of uncertainty or decline the funds and remain uninhibited by the federal conditions. *Pennhurst* does not suggest, as defendants would have it, that conditional spending is appropriate only when Congress spells out in detail the full potential extent of a state's liability.

The Supreme Court has upheld application of spending clause legislation containing a condition described at a level of generality comparable to that found in the Religious Land Use and Institutionalized Persons Act. In *Davis v. Monroe County Bd. of Education*, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), the Court noted that the general condition attached to funds received by states under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), satisfied the second requirement of the *Dole* test. Title IX's condition provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or

activity receiving federal financial assistance." In *Monroe*, the Court concluded that Title IX's general language proscribes the toleration by school officials of sufficiently severe student-on-student sexual harassment with the requisite clarity to satisfy *Pennhurst's* notice requirement, even though in individual cases the question "[w]hether gender-oriented conduct rises to the level of actionable 'harassment' ... 'depends on a constellation of surrounding circumstances, expectations, and relationships.'" *Monroe*, 526 U.S. at 650–51, 119 S.Ct. 1661 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). The majority reached this conclusion notwithstanding the dissenters' assertion that this "multifactored balancing test is a far cry from the clarity we demand of Spending Clause legislation." *Id.* at 675, 119 S.Ct. 1661 (Kennedy, J., dissenting).

In short, existing Supreme Court precedent does not support defendants' contention that the "least restrictive means" standard incorporated in the act is too ambiguous, when applied to an individual case, to put states on notice of the conditions they are required to satisfy in exchange for accepting federal funds and defendants have not identified any cases from the Court of Appeals for the Seventh Circuit to that effect. Accordingly, I conclude that Congress stated unambiguously the conditions attached to the receipt of federal grants imposed by the act, allowing states to make an informed decision whether to accept or reject the relevant federal funds.

### 3. *Conditions related to a federal interest*

The third limitation on conditional federal spending is embodied in the Supreme Court's recognition that "conditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in

particular national projects or programs.' " *Dole,* 483 U.S. at 207, 107 S.Ct. 2793 (quoting *Massachusetts v. United States,* 435 U.S. 444, 461, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978) (plurality opinion)); *see also Ivanhoe Irrigation Dist. v. McCracken,* 357 U.S. 275, 295, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958) ("[T]he Federal Government may establish and impose reasonable conditions relevant to [the] federal interest in the project and to the over-all objectives thereof."); *Kansas v. United States,* 214 F.3d 1196, 1199 (10th Cir.2000) ("The required degree of . . . relationship is one of reasonableness or minimum rationality."). In *Dole,* the Court noted that this requirement has not been elaborated on in any significant fashion, an observation that remains true to this day. Some commentators view the so-called "germaneness" requirement as a potentially significant limitation on Congress's conditional spending power, but acknowledge that the Court has provided "neither a workable definition" of the requirement "nor any actual or hypothetical example" of its violation. Lynn A. Baker, *Conditional Federal Spending after Lopez,* 95 Colum. L.Rev.1911, 1933, 1960 (1995) (arguing that in *Dole,* the majority sought only "to ensure minimum rationality in the relationship between the funding condition and the federal interest sought to be advanced"); *see also* Tribe, *supra,* § 5–6, at 838 (germaneness limitation "has not been fleshed out in *Dole* or in any other case and has not served as the basis for actually invalidating an exercise of the spending power").

The conditions imposed by the Religious Land Use and Institutionalized Persons Act are substantially related to the federal interests that are advanced when Congress appropriates funds to assist the states in implementing prison activities or programs. The act's congressional sponsors have observed that "[w]hether from indifference, ignorance, bigotry, or lack of re-sources, some institutions restrict religious liberty in egregious and unnecessary ways." 146 Cong. Rec. S7775 (daily ed. July 27, 2000) (joint statement of Sens. Hatch & Kennedy). Congress can rationally seek to insure that the funds it appropriates for state use and which the states voluntarily accept are not used to frustrate prisoners' exercise of religion. Moreover, the Wisconsin Department of Corrections accepts millions of dollars annually in federal funds designated for the treatment of prisoners' alcohol, drug and mental health problems, for educating prisoners and for treating convicted sex offenders. Such funding evidences an obvious federal interest in the rehabilitation of state inmates. Religion is also perceived to have rehabilitative qualities. *See, e.g.,* 139 Cong. Rec. S14465 (daily ed. Oct. 27, 1993) ("exposure to religion is the best hope we have for rehabilitation of a prisoner") (statement of Sen. Hatch); ("[I]f religion can help just a handful of prison inmates get back on track, then the inconvenience of accommodating their religious beliefs is a very small price to pay.") (statement of Sen. Dole) (commenting on the Religious Land Use and Institutionalized Persons Act's predecessor, the Religious Freedom Restoration Act). Congress can rationally seek to insure that states receiving federal funds targeted at rehabilitating prisoners are not simultaneously using those funds or other federal money to impede prisoners' exercise of religion and its perceived rehabilitative effects.

■ Defendants argue that spending clause legislation must withstand "a particularized, program-by-program analysis of the relationship between conditions and the purposes of spending programs." Dfts.' Reply Br. in Supp. of Mot. for Summ. J., dkt. # 74, at 8. According to this theory, there must be a particularized relationship between a condition's subject mat-

ter and the underlying federal grant to which the condition attaches. Because the department does not receive federal funds for religious programming, defendants argue, no such relationship exists. However, this theory finds no support in the Court's spending clause jurisprudence. In *Dole,* the court upheld a federal statute that conditioned a portion of states' aggregate federal highway funds on their willingness to adopt a 21–year–old minimum drinking age. The Court did not require that the funds to which the condition was attached be earmarked specifically for combating drunk driving. In *Oklahoma v. Civil Service Comm'n,* 330 U.S. 127, 129 n. 1, 67 S.Ct. 544, 91 L.Ed. 794, the Court upheld a provision of the Hatch Act prohibiting state employees "whose principal employment is in connection with *any* activity which is financed in whole or in part" by the United States from taking "any active part in political management or in political campaigns." (Emphasis added). The Court found this exercise of the spending power unexceptionable even though it was not tied to any one particular spending program. *Id.* at 144, 67 S.Ct. 544 ("The offer of benefits to a state by the United States dependent upon cooperation by the state with federal plans, assumedly for the general welfare, is not unusual."). In *United States v. Dierckman,* 201 F.3d 915, 922–23 (7th Cir.2000), the Court of Appeals for the Seventh Circuit found unobjectionable spending clause legislation that conditioned the receipt of United States Department of Agriculture farm benefits on a farmer's willingness to refrain from cultivating wetlands. The benefits jeopardized by failure to comply with that condition were not limited to only those bearing some particular relationship to wetlands preservation. Similarly, in this case the conditions imposed by the Religious Land Use and Institutionalized Persons Act are not unconstitutional merely because they apply to the Department of Corrections generally, rather than to religious programming specifically.

Next, defendants note that federal funds account for less than two percent of the department's budget and argue that the act is unconstitutional because its conditions are out of proportion to this narrow funding stream. In advancing this argument, defendants rely principally on *Federal Communications Commission v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), but that case is inapposite. As intervenor United States points out, the First Amendment, not the spending clause, dictated the outcome of that case and the court never considered whether an exercise of the spending power is valid only when there is some kind of proportional relationship between the size of a federal grant and the conditions attached to it. Indeed, defendants do not explain how a court is to judge whether the size of an appropriation is "proportional" to a particular policy condition. Because spending clause legislation is "much in the nature of a contract," *Pennhurst,* 451 U.S. at 17, 101 S.Ct. 1531, there is little need for a proportionality test. If the conditions imposed by the federal government are so out of proportion to the size of the funding stream on offer, a rational state will decline the funds and remain free of the onerous conditions. If courts had to consider a proportionality requirement in conjunction with the requirement (discussed below) that the financial inducements offered by Congress not be so great as to become coercive, they would be required to scrutinize spending clause legislation to insure that Congress did not offer too much money in relationship to a particular condition (coercion) or too little (proportionality), but just the right amount. In most circumstances, as here, judgments about the merits of a grant's size in relation to the attached conditions are best left to the political

branches of the state and federal governments, as they go through the contractual motions of offer and acceptance of the federal funds.

### 4. *Violation of other constitutional provisions*

The fourth requirement courts must assess in evaluating spending clause legislation is whether any other provision of the Constitution acts as an independent bar to the conditional grant of federal funds. *Dole*, 483 U.S. at 208, 107 S.Ct. 2793. The Court described the contours of this requirement in *Dole*, explaining that

> the 'independent constitutional bar' limitation on the spending power is not, as petitioner suggests, a prohibition on the indirect achievement of objectives which Congress is not empowered to achieve directly. Instead, we think that the language in our earlier opinions stands for the unexceptionable proposition that the power may not be used to induce the States to engage in activities that would themselves be unconstitutional. Thus, for example, a grant of federal funds conditioned on invidiously discriminatory state action or the infliction of cruel and unusual punishment would be an illegitimate exercise of the Congress' broad spending power.

*Id.* at 210–11, 107 S.Ct. 2793. Although defendants argue separately that the act itself violates the Tenth Amendment and the First Amendment's establishment clause, they do not contend that compliance with the act induces Wisconsin to engage in unconstitutional activity. Accordingly, the act does not violate the independent constitutional bar limitation on the spending power.

### 5. *Coercion vs. encouragement*

Finally, the Supreme Court has noted that "in some circumstances, the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.' " *Id.* at 211, 107 S.Ct. 2793 (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590, 57 S.Ct. 883, 81 L.Ed. 1279 (1937)). In *Dole*, the Court held that the potential reduction of federal highway funds by a mere five percent was plainly insufficient to rise to the level of coercion. *Id.* Citing *Steward*, the Court observed that "to hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficulties. The outcome of such a doctrine is the acceptance of a philosophical determinism by which choice becomes impossible." *Id.* Indeed, the Supreme Court has provided no guidance on what kind of inducement might amount to impermissible coercion and several courts have questioned the continuing viability of the coercion theory. *See, e.g., Kansas*, 214 F.3d at 1202 ("the coercion theory is unclear, suspect, and has little precedent to support its application"); *California v. United States*, 104 F.3d 1086, 1092 (9th Cir.1997) ("to the extent that there is any viability left in the coercion theory, it is not reflected in the facts of this record"); *Nevada v. Skinner*, 884 F.2d 445, 448 (9th Cir.1989) ("can a sovereign state which is always free to increase its tax revenues ever be coerced by the withholding of federal fund—or is the state merely presented with hard political choices?"); *see also* Erwin Chemerinsky, *Protecting the Spending Power*, 4 Chap. L.Rev. 89, 102 (2001) ("All conditions on financial aid from Congress to the states are meant to be an inducement; there is no way to define when this becomes impermissible compulsion."); *but see West Virginia v. United States Dept. of Health and Human Serv.*, 289 F.3d 281, 291 (4th Cir.2002) ("the coercion theory remains viable in this circuit, and federal statutes that threaten the loss of an entire block of federal funds upon a relatively minor failing by a state are constitutionally suspect").

Regardless of the current health of the coercion theory, there is no plausible coercion argument in this case. Defendants acknowledge that the approximately $15 million in federal funds it accepted in 2001 made up less than two percent of the Department of Corrections budget. The potential loss of this fraction of the department's overall budget does not impermissibly coerce Wisconsin into complying with the Religious Land Use and Institutionalized Persons Act. It would effectively eviscerate Congress's spending clause power to hold that such a small grant could coerce a sovereign state. It would also offend the sovereign dignity of the state of Wisconsin, casting it as little more than a fiscally impoverished dependent of the federal government.

For the reasons discussed above, I conclude that the Religious Land Use and Institutionalized Persons Act is a constitutionally valid exercise of Congress's spending power.

### B. *Commerce Clause*

In addition to applying to programs or activities that receive federal financial assistance, the act applies when a substantial burden on the religious exercise of a prisoner affects interstate commerce. 42 U.S.C. § 2000cc–1(b)(2). Because I have found that the act is a valid exercise of Congress's spending power, I need not consider whether the act is a valid exercise of congressional authority under the commerce clause as well.

### C. *Tenth Amendment*

■ The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Defendants argue that the act "is void because it violates state sovereignty, and hence the Tenth Amendment." Dfts.' Br. in Supp. of Mot. for Summ. J., dkt. # 41, at 29. Defen-

dants' argument must fail because the Supreme Court has "held that a perceived Tenth Amendment limitation on congressional regulation of state affairs did not concomitantly limit the range of conditions legitimately placed on federal grants." *Dole*, 483 U.S. at 210, 107 S.Ct. 2793; *see also Civil Service Comm'n*, 330 U.S. at 143, 67 S.Ct. 544 (Even though "the United States is not concerned with, and has no power to regulate, local political activities ... of state officials," Hatch Act did not violate Tenth Amendment because federal government has "power to fix the terms upon which its money allotments to states shall be disbursed").

■ The Tenth Amendment directs courts "to determine ... whether an incident of state sovereignty is protected by a limitation on an Article I power." *New York v. United States*, 505 U.S. 144, 157, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). The *Dole* requirements place limits on the exercise of Congress's Article I spending power. When those requirements are complied with, no Tenth Amendment issue arises because the requirements insure that states, in the final analysis, may choose freely whether to accept or forgo federal funds. *Id.* at 168, 112 S.Ct. 2408 ("If a State's citizens view federal policy as sufficiently contrary to local interests, they may elect to decline a federal grant."). In short, when Congress engages in an otherwise valid exercise of its spending power, the Tenth Amendment is not implicated.

### D. *Establishment Clause*

■ The First Amendment's establishment clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I, cl. 1. Statutes challenged under the establishment clause are evaluated by applying the three-part test laid out in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29

L.Ed.2d 745 (1971). "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive governmental entanglement with religion.'" *Id.* at 612–13, 91 S.Ct. 2105 (citations omitted); *Freedom from Religion Foundation v. Bugher,* 249 F.3d 606, 610 (7th Cir.2001). Defendants contend that the Religious Land Use and Institutionalized Persons Act fails the second prong of the *Lemon* test because it has the principal or primary effect of advancing religion. I note at the outset that defendants' establishment clause challenge to the Religious Land Use and Institutionalized Persons Act is something of an uphill battle in this circuit, as the Court of Appeals for the Seventh Circuit rejected an analogous challenge to the act's broader predecessor, the Religious Freedom Restoration Act, in *Sasnett v. Sullivan,* 91 F.3d 1018, 1022 (7th Cir.1996), *vacated on other grounds,* 521 U.S. 1114, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997).

Defendants rely on *Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (plurality opinion). In that case, the Supreme Court considered a Texas statute exempting from the state's sales tax periodicals published or distributed by a religious faith consisting entirely of writings promulgating the faith's teachings. *Id.* at 5, 109 S.Ct. 890. Noting that the Constitution prohibits "legislation that constitutes an endorsement of one or another set of religious beliefs or of religion generally," *id.* at 8, 109 S.Ct. 890, the Court held that "when government directs a subsidy exclusively to religious organizations that is not required by the Free Exercise Clause and that either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion," then the government effectively endorses religion. *Id.* at 15, 109 S.Ct. 890. Defendants argue that because the standard imposed by the act is (1) not mandated by the free exercise clause and (2) prison administrators or other inmates will be burdened if defendants are forced to comply with the act, the act violates the establishment clause.

This argument proves too much. It implies that the establishment clause is violated by any prison program or activity designed to facilitate the exercise of religion by prisoners that is not strictly mandated by the free exercise clause. As defendants note, "most restrictions on prisoners' religious activities are based on management, security or other operational concerns, and accommodating such exercise will necessarily burden others." Dfts.' Br. in Supp. of Mot. for Summ. J., dkt. # 41, at 35 (citing *Turner v. Safley,* 482 U.S. 78, 90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) ("In the necessarily closed environment of the correctional institution, few changes will have no ramifications on ... others")). Therefore, according to defendants' theory, when a prison administrator accommodates a religious practice in a way (1) not required by the free exercise clause, it will (2) "necessarily burden others," resulting in a probable violation of the establishment clause. I cannot conclude that the establishment clause sweeps so broadly or cabins so narrowly the discretion of those prison administrators who choose to accommodate prisoners' religious exercise in ways not strictly mandated by the free exercise clause.

Moreover, unlike the broad sales tax exemption at issue in *Texas Monthly,* the Religious Land Use and Institutionalized Persons Act does not involve governmental subsidization of religion. In *Cohen v. City of Des Plaines,* 8 F.3d 484, 492–93 (7th Cir.1993), the Court of Appeals for the Seventh Circuit emphasized the signifi-

cance of the subsidy issue to the result in *Texas Monthly*. *Cohen* involved a zoning ordinance exempting church nursery schools from obtaining an otherwise necessary special use permit to operate day care centers. After the plaintiff was denied a special use permit to operate a secular day care center, he sued, alleging that the exemption for churches violated the establishment clause. In distinguishing *Texas Monthly* and upholding the zoning exemption, the court of appeals noted that the "zoning ordinance exemption does not require the general population to subsidize religious organizations." The same is true of the Religious Land Use and Institutionalized Persons Act. Although states may incur some costs in accommodating prisoners' religious exercise under the act, costs incurred in that fashion are not fairly comparable to the total sales tax exemption at issue in *Texas Monthly*, which amounted to an "unjustifiable award[ ] of assistance to religious organizations." *Texas Monthly*, 489 U.S. at 15, 109 S.Ct. 890 (citation omitted).

Defendants rely on *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985), but that decision is well off point. In that case, the Supreme Court considered a private employer's challenge to a Connecticut law providing employees with the absolute right not to work on their chosen Sabbath. The Court held that the statute imposed on employers "an absolute duty to conform their business practices to the particular religious practices of the employee" and for that reason violated the establishment clause because in enacting the statute

> [t]he State . . . command[ed] that Sabbath religious concerns automatically control over all secular interests at the workplace; the statute takes no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath. The employer and others must adjust their

affairs to the command of the State whenever the statute is invoked by an employee.

*Id.* at 709, 105 S.Ct. 2914. Of course, the same cannot be said of the Religious Land Use and Institutionalized Persons Act. It invests prisoners with no absolute rights. Rather, under the act, prison administrators are free to substantially burden a prisoner's religious exercise when the imposition is in furtherance of a compelling government interest and is accomplished using the least restrictive means available. *See* 42 U.S.C. § 2000cc 1(a). Proof that administrators need not accede to an inmate's desires "whenever the statute is invoked" can be found in this very case, in which I rejected plaintiff's claim that under the act he is entitled to more than one religious feast each year. Accordingly, *Caldor* is inapposite.

Finally, defendants' argument is foreclosed by *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos*, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987), in which the Supreme Court considered whether the statutory provision exempting religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion violated the establishment clause. The district court had held that the exemption had the primary effect of advancing religion and thus failed the second prong of the *Lemon* test because, among other things, it imposed a burden on certain employees of religious institutions who were stripped of Title VII's protection. *Id.* at 333, 107 S.Ct. 2862. The Supreme Court reversed, noting that an earlier version of the exemption had applied only to the religious activities of religious organizations, not to their secular activities. The Court assumed that the First Amendment's free exercise clause required nothing more. Nevertheless, it found that although the amended exemption applied to a religious

organization's secular activities as well as its religious ones, it did not violate the establishment clause, even though it was not required by the free exercise clause and even though it burdened those persons who were deprived of Title VII's protection through its operation. Accordingly, *Amos* cannot be squared with defendants'· argument that religious accommodations not compelled by the free exercise clause are unconstitutional whenever they burden third parties.

The Court noted in *Amos* that "[t]here is ample room under the Establishment Clause for 'benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.' " *Id.* at 334, 107 S.Ct. 2862 (quoting *Walz v. Tax Comm'n,* 397 U.S. 664, 669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)); *see also Board of Educ. of Kiryas Joel Village School District v. Grumet,* 512 U.S. 687, 705, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) ("Our cases leave no doubt that in commanding neutrality the Religion Clauses do not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice.").

Defendants have failed to demonstrate that the Religious Land Use and Institutionalized Persons Act amounts to a governmental endorsement of religion or that it does anything more than permissibly limit government-imposed barriers to the free exercise of religion. Therefore, I find no establishment clause violation.

Because I conclude that the Religious Land Use and Institutionalized Persons Act is a constitutionally valid exercise of Congress's spending power, does not violate the Tenth Amendment to the Constitution and does not violate the First Amendment's establishment clause, I will enter summary judgment on the court's own motion in favor of plaintiff on his claim that, as applied by defendants to

prevent him from possessing prayer oil in his cell, the prison's religious property Internal Management Procedure violates the act because it does not represent the approach to controlling administrative costs and preserving prison resources that is least restrictive of plaintiff's exercise of his religion. *See* April 15, 2002 Opinion and Order, dkt. # 63, at 22–33. Plaintiff will be awarded injunctive relief. To the extent plaintiff sought declaratory relief, it appears from his complaint that he sought a declaration that defendants' acts were unconstitutional. I concluded in the court's April 15, 2002 order that defendants did not violate the Constitution. *Id.* at 34–35. Rather, defendants have violated a federal statute. Accordingly, plaintiff is not entitled to the declaratory relief he seeks. Finally, plaintiff is not entitled to money damages because, as the court explained in the April 15 order, defendants are qualifiedly immune to plaintiff's demand for money damages under the act. *Id.* at 35–38.

### ORDER

IT IS ORDERED that

1. The motion of defendants Dick Verhagen and Jon Litscher for summary judgment on plaintiff Jerry Charles's claim under the Religious Land Use and Institutionalized Persons Act relating to prayer oil is DENIED;

2. On the court's own motion, plaintiff is GRANTED summary judgment on his Religious Land Use and Institutionalized Persons Act claim relating to prayer oil;

3. Defendants are enjoined from enforcing religious property Internal Management Procedure 6A to prevent plaintiff from possessing a reasonable quantity of prayer oil in his cell.