**Richard K. LOVELL, Plaintiff–Appellee,**

**v.**

**Susan CHANDLER, in her official capacity as the Director of the Department of Human Services of the State of Hawaii; State of Hawaii, Defendants–Appellants.**

**Douglas D. Delmendo, an incapacitated person, by his appointed guardian—Zosima Orillo Delmendo, Plaintiff–Appellee,**

**v.**

**Susan Chandler, in her official capacity as the Director of the Department of Human Services of the State of Hawaii; State of Hawaii, Defendants–Appellants.**

Nos. 98–16545, 99–15930, 98–16548, 99–15928.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 2, 1999.

Submission Withdrawn Jan. 31, 2000.

Resubmitted Aug. 28, 2002.

Filed Sept. 5, 2002.

end-of-year adjustments as are appropriate to arrive at the Medicare rate.

See also: 939 F.Supp. 765.

Earl I. Anzai, Attorney General; Charles Fell, Senior Deputy Attorney General; Nancy Albano, Deputy Attorney General; Madeleine Austin, Deputy Attorney General, State of Hawaii, Honolulu, HI, for the defendants-appellants.

Shelby Anne Floyd; Corianne W. Lau; Jason H. Kim, Alston Hunt Floyd & Ing, Honolulu, HI, for the plaintiffs-appellees.

Before D.W. NELSON, KOZINSKI and W. FLETCHER, Circuit Judges.

## OPINION

WILLIAM A. FLETCHER, Circuit Judge.

In an underlying class action suit, part of which is still pending, the district court granted partial summary judgment for plaintiffs against the State of Hawaii ("the State") on the issues of unlawful discrimination and general liability for compensatory damages under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and § 504 of the Rehabilitation Act (RA), 29 U.S.C. § 794(a), based on the State's exclusion of certain disabled people from its health insurance programs. *See Burns–Vidlak v. Chandler*, 939 F.Supp. 765, 773 (D.Haw.1996). The class consists of disabled individuals who, but for their disabilities, would have been eligible for Hawaii's QUEST medical coverage. The district court certified this class retroactively for the purpose of determining general liability for compensatory damages and prospectively for the purpose of determining liability for punitive damages. It did not certify the class for purposes of determining the amount of compensatory damages in individual cases. Instead, the district court directed the individual class members to file individual suits for such

determinations. Two of those individual suits, filed by Richard Lovell and Douglas Delmendo, have concluded after bench trials with awards of compensatory damages and are the subject of the current consolidated appeal.

The State—though questioning our jurisdiction to hear this appeal due to the lack of a final judgment in the ongoing class action with respect to punitive damages— appeals the underlying determination of unlawful discrimination, the underlying conclusion that the class plaintiffs are entitled to compensatory damages, and the award of litigation expenses to Lovell and Delmendo. We hold that we have jurisdiction to hear this appeal under 28 U.S.C. § 1291, and we affirm on the merits.

I. Hawaii's Health Insurance Programs

Prior to August 1, 1994, the State of Hawaii provided medical benefits to some of its most financially needy residents through a fee-for-service ("FFS") Medicaid program. Medicaid served the aged, blind, and disabled ("ABD") population, those receiving Aid to Families with Dependent Children ("AFDC"), and those receiving general assistance ("GA") benefits. Membership in these groups alone did not, however, automatically lead to benefits eligibility. In order to receive Medicaid benefits, group members also had to have an income no greater than 100% of the federal poverty level and assets not in excess of $2,000.

In recognition of the fact that these income and asset tests left uninsured a sizable group of the poor, including the working poor, the State extended medical and dental benefits to a "gap group" whose income was no greater than 300% of the federal poverty level through the State Health Insurance Program ("SHIP"), a limited FFS program. SHIP did not contain an asset test. Some participants in SHIP were aged, blind, or disabled residents who could not meet the more stringent income and asset requirements of the State's Medicaid program.

On August 1, 1994, the State launched a new program, QUEST, to begin transforming its FFS programs into a more cost-effective HMO-based plan. Recipients of GA and AFDC, as well as SHIP participants, were eligible to receive benefits under QUEST if their income was no more than 300% of the federal poverty level, unless they were aged, blind, or disabled. The ABD population was categorically excluded from QUEST on the basis of age, blindness, or disability:

> *Categorical requirements.* Persons who are ineligible to participate in Hawaii Health QUEST include the following groups of individuals.
>
> (1) Persons who are age sixty-five or older.
>
> (2) Persons who are blind or disabled according to the criteria employed by the Social Security Administration.

Haw. Admin. R. § 17–1727–13 (1994). The State eliminated its prior FFS programs, except for ABD individuals who qualified under the prior FFS Medicaid criteria. As a result, ABD persons who met the Medicaid income and asset tests retained their benefits under the old FFS system, but several hundred blind and disabled members of the SHIP population were denied any coverage under QUEST.

According to its brief, the State excluded ABD persons from QUEST "because the lack of actuarial data and anticipated high costs due to their special needs produced lack of predictability, which would result in health care insurers refusing to participate in QUEST." The State asserts that it would have been unable to implement the program without such providers. The State claims that it planned to allow the ABD to receive benefits under QUEST

at some later date, after it had demonstrated the success of the initial program.

On March 30, 1996, the State amended its QUEST program. Although the State retained QUEST's exclusion of all ABD people, it imposed the same asset test as the Medicaid FFS program for all participants, thereby excluding non-ABD former SHIP members from participation in QUEST as well. *See* Haw. Admin. R. § 17–1727–14 (as amended Mar. 30, 1996).[1] The question of whether QUEST, as amended, complies with federal law is not before us.[2] Lovell and Delmendo base their claims on the QUEST program as it existed from August 1, 1994 to March 30, 1996.

## II. Procedural History

### A. Class Action

On November 2, 1995, Shea Burns–Vidlak, a disabled minor, and George Cohn, a blind adult, filed a complaint in federal district court against Susan Chandler, the Director of the Hawaii Department of Human Services, and, upon later amendment, against the State of Hawaii. The plaintiffs alleged that they would have been eligible for benefits under QUEST but for their disabilities, and that QUEST's categorical exclusion of persons with disabilities violated Title II of the ADA and Section 504 of the RA. On February 14, 1996, the plaintiffs filed a motion for partial summary judgment.

The State raised several defenses in opposition. First, the State argued that the

plaintiffs were not discriminated against solely by reason of disability, but rather on the basis of financial criteria plus their disability. Second, the State claimed that the United States Health Care Financing Administration ("HCFA"), an agency within the Department of Health and Human Services ("DHHS"), granted the State a waiver from compliance with the ADA and the RA on the ground that QUEST was an experimental program. Third, the State argued that QUEST's exclusion of disabled persons was permissible under ADA and RA regulations because the exclusion was "necessary" to ensure the financial viability of the program.

On April 12, 1996, the district court rejected the State's defenses and granted the plaintiffs partial summary judgment, concluding that the State had violated the ADA and the RA between August 1, 1994 and March 30, 1996 because of its facial, categorical exclusion of all otherwise-qualified disabled persons from QUEST. *See Burns–Vidlak*, 939 F.Supp. at 773. The district court held that the plaintiffs were generally entitled to recover compensatory damages, but did not address the issue of the specific amount of compensatory damages for particular individuals. On May 15, 1996, plaintiffs filed an amended complaint requesting punitive damages.

Prior to the April ruling, on March 4, 1996, the plaintiffs had filed a motion for class certification. On June 27, 1996, after the district court had granted plaintiffs summary judgment on the question of lia-

---

**1.** The eligibility criteria for QUEST were amended again in December 1997 to reduce the income limit for most individuals to 100% (from 300%) of federal poverty level (still excluding the ABD population), thereby placing the entire "gap group" outside QUEST. *See* Haw. Admin. R. § 17–1727–14 (as amended Dec. 27, 1997). Though amended several times since, the current regulation maintains these basic criteria.

**2.** The district court in *Burns–Vidlak* only addressed the State's liability for the period from August 1, 1994 to March 30, 1996, dismissing as moot at that time the plaintiffs' claim for injunctive relief given the amendment to QUEST and given a new provision of limited coverage for ABD people with greater assets. *See Burns–Vidlak*, 939 F.Supp. at 766–67.

bility for compensatory damages, and after plaintiffs had amended their complaint to seek punitive damages, the court partially granted plaintiffs' motion for class certification. *Burns–Vidlak,* No. 95–00892 ACK, Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification (D. Haw. filed June 27, 1996) (unpub.order). The court held that class treatment was appropriate for the already decided question of general liability for compensatory damages, and for the undecided question of the State's liability for punitive damages. *Id.* at 8. However, the court directed the individual class members to file separate actions for particularized determinations of the amount of compensatory damages the State owed them. *Id.* at 9.

On December 19, 1997, on the State's motion, the district court issued an order clarifying its April 12, 1996 order with respect to compensatory damages. *Burns–Vidlak,* No. 95–00892 ACK, Order of Clarification Regarding Compensatory Damages (D. Haw. filed Dec. 19, 1997) (unpub.order). The district court explained that it had found that the State had engaged in "intentional discrimination" warranting the imposition of compensatory damages. *Id.* at 3. "[T]he State, despite its good faith efforts, deliberately intended to discriminate against and to deprive all blind and disabled individuals from their federally protected rights under the ADA and the RA during the subject transition period, although such transition period would ultimately lead to equal benefits." *Id.* at 4. The court also found that "the scope of compensatory damages encompasses both general and special damages," to be individually assessed in the separate actions filed by individual class members. *Id.* at 7.

### B. Appellees' Individual Actions

More than 300 class members filed individual actions for compensatory damages in the Hawaii district court. With the parties' consent, the QUEST-related cases were transferred to Magistrate Judge Barry M. Kurren on February 25, 1998.

On July 20 and 22, 1998, Lovell and Delmendo were awarded $10,192.22 and $1,053.21, respectively, at the conclusion of separate bench trials. The trial court also awarded each of them reimbursement for attorneys' fees, costs (including expert witness fees), and prejudgment interest. In addition, the trial court certified that its ruling constituted a final judgment pursuant to Federal Rule of Civil Procedure 54(b), based on a finding that there was no just reason for delay. The State's appeal from these two individual judgments is now before us.

### III. Appellate Jurisdiction

■ We address our appellate jurisdiction before we address the merits. *See Williamson v. UNUM Life Ins. Co. of Am.,* 160 F.3d 1247, 1250 (9th Cir.1998). The State contends that it has filed the instant appeals "in an abundance of caution," and argues that this court does not have appellate jurisdiction under 28 U.S.C. § 1291. Section 1291 grants this court jurisdiction over "final decisions" of the district courts. A decision is normally final and appealable under 28 U.S.C. § 1291 only if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945). Pursuant to Federal Rule of Civil Procedure 54(b), a district court "may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties" if it expressly determines that there is no just reason for delay. The State questions the finality of the judgments before us because the issue of punitive damages in the underlying *Burns–Vidlak* class action remains unresolved, and because Lovell and Delmendo's requests for equitable relief in their indi-

vidual complaints have never been adjudicated.

■ The State relies chiefly on *Arizona State Carpenters Pension Trust Fund v. Miller*, 938 F.2d 1038 (9th Cir.1991), for its argument that the ongoing litigation of punitive damages in the continuing *Burns–Vidlak* class action prevents us from exercising appellate jurisdiction. In *Miller*, the district court dismissed a punitive damages count in a case alleging breach of fiduciary duty under ERISA, and it certified its dismissal of that count of the complaint as appealable pursuant to Rule 54(b). We concluded that this court did not have jurisdiction to hear the appeal despite the Rule 54(b) certification, noting that "the count for punitive damages is not 'separate and distinct' from the remainder of the counts in the complaint, but is based on a single set of facts giving rise to a legal right of recovery under several different remedies." *Id.* at 1040(quoting *Denholm v. Houghton Mifflin Co.*, 912 F.2d 357, 360(9th Cir.1990)). The punitive damages count and the compensatory damages count were "inextricably intertwined." *Id.* (internal quotation marks omitted). Accordingly, we held that the punitive damages count was not a separate claim, and that judgment on the claim was not final. *Id.* The State argues that because there is an unresolved punitive damages claim in the pending class action, the judgments for compensatory damages in the individual actions are not final and cannot be reviewed under *Miller.*

The State's position fails to account for the unique procedural posture of the instant appeals. Unlike the appeal in *Miller*, these appeals arise from individual lawsuits in which Lovell and Delmendo sought only compensatory, not punitive, damages. Neither side disputes that there was no claim for punitive damages in their individual suits, and that the punitive damages claim will be litigated by the class representatives in the separate *Burns–Vidlak* class action case. Indeed, because there was no claim for punitive damages in the individual suits, the trial court in *Lovell* correctly determined that there was not even any need for Rule 54(b) certification, which is only applicable if there are multiple claims. It wrote:

> This court does not believe [Rule 54(b)] certification is required. The *Burns–Vidlak* class was certified for purposes of liability for compensatory and punitive damages and for a determination of the proper amount of punitive damages. Issues related to punitive damages for the *Burns–Vidlak* class are on appeal to the Ninth Circuit. This court believes that all issues in connection with punitive damages, including Plaintiff's entitlement to a specific award, remain pending in the *Burns–Vidlak* action and do not prevent this order from being a final ruling in the instant case.

Because the claims for compensatory damages and punitive damages arise in separate cases, they are not "inextricably intertwined" as they were in *Miller*.[3] We therefore deem the trial court's award of compensatory damages to be a final decision.

■ That we will need, in effect, to review the merits of the partial grant of summary judgment in *Burns–Vidlak* in order to decide the current appeals does not alter our conclusion. The current appeals arise from two separate individual actions that have concluded.[4] The fact that the

---

**3.** We also note that the Supreme Court recently held that punitive damages are not available in a private cause of action brought under § 202 of the ADA and § 504 of the RA. *See Barnes v. Gorman*, —— U.S. ——, 122 S.Ct. 2097, 2103, 153 L.Ed.2d 230 (2002).

**4.** The lower court refused to certify the compensatory damage award of the named plain-

decisions in these separate actions incorporated by reference the reasoning and result of the *Burns–Vidlak* partial summary judgment does not make their judgments any less final. The court could easily have repeated the reasoning, and have reached the same result, without expressly citing the *Burns–Vidlak* order; we fail to see why this should affect the appealability of the result. Further, "[a]n appeal from a final judgment draws in question all earlier, non-final orders and rulings which produced the judgment." *Litchfield v. Spielberg,* 736 F.2d 1352, 1355(9th Cir.1984). The grant of partial summary judgment in *Burns–Vidlak* could be viewed as such an order. Review of the substance of that order is "necessary to ensure meaningful review" of the *Lovell* and *Delmendo* judgments. *Clinton v. Jones,* 520 U.S. 681, 707 n. 41, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (quoting *Swint v. Chambers Cty. Comm'n,* 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995)).

From a practical standpoint, denying appellate jurisdiction in these cases would needlessly interfere with efficient judicial administration. There are over 300 pending individual compensatory damages actions arising from the *Burns–Vidlak* class action. To withhold appellate review until a continuing class action, in which the only remaining issue is punitive damages, becomes final would create unnecessary delay and uncertainty for the individual actions and would not further judicial economy in the class action. *See, e.g., Williamson,* 160 F.3d at 1250–51(stating that special circumstances could warrant a conclusion of practical finality in regard to a partial summary judgment order); *French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 784 F.2d 902, 905 n. 3 (9th

Cir.1986) (finding that "no practical benefits would accrue from a dismissal for lack of appellate jurisdiction"). This court will inevitably, at some point, review the underlying liability determination; now that the issue is before us, given the completion of Lovell and Delmendo's individual suits, there is no reason to wait any longer to make that determination. We thus hold that the pendency of the class action with respect to punitive damages does not deprive us of jurisdiction to hear these appeals.

■ The State also argues that the individual actions now before us have not yet become final because the trial court never ruled upon Lovell and Delmendo's additional claims for injunctive or declaratory relief. Lovell and Delmendo respond that they abandoned these claims before trial, as evidenced by the absence of the claims from the pre-trial statements, the lack of any subsequent proceedings or motions in relation to the claims, and the court's apparent belief that it was adjudicating all of the issues still before it when it issued its judgments.

■ Abandoned claims do not compromise the finality of the judgment if it is clear that the trial court intended to dispose of all the claims before it. *See Spitz v. Tepfer,* 171 F.3d 443, 447–48 (7th Cir. 1999); *Chiari v. City of League City,* 920 F.2d 311, 314 (5th Cir.1991); *see also Alaska v. Andrus,* 591 F.2d 537, 540 (9th Cir. 1979) (using a "common sense" approach to finality requirement to infer the rejection of a claim). The post-complaint filings in Lovell and Delmendo's individual cases support the conclusion that they indeed abandoned their claims for equitable relief, and the court below did not believe any

---

tiff in the *Burns–Vidlak* action as a final judgment under Rule 54(b) due to the ongoing claim for punitive damages in the same case. *See Burns–Vidlak,* No. 95–00892 BMK, Order

Denying Defendants' Motion for Entry of Final Judgment as to Individual Claims of Plaintiff Shea Burns–Vidlak and Rule 54(b) Certification (D. Haw. filed July 30, 1999).

additional claims for relief were still pending when it entered its judgment. In its written orders in *Lovell* and *Delmendo,* the trial court described the actions as "individual action[s] seeking general and special damages and prejudgment interest." Further, the fact that the court did not believe Rule 54(b) certification to be necessary supports the inference that it did not consider any claims to be outstanding. We therefore hold that Lovell and Delmendo's initial requests for equitable relief in their individual complaints were abandoned, and that those requests do not deprive us of appellate jurisdiction over the court's final rulings on compensatory damages.

## IV. Eleventh Amendment Immunity

 The State asserts sovereign immunity under the Eleventh Amendment against Lovell and Delmendo's claims under Title II of the ADA and § 504 of the RA. Whether a state has immunity under the Eleventh Amendment presents questions of law reviewed de novo. *See Demshki v. Monteith,* 255 F.3d 986, 988 (9th Cir.2001).

 States are protected in various ways by the Eleventh Amendment, or, to state it more accurately, by the sovereign immunity principle for which the Amendment has come to stand. *See, e.g., Alden v. Maine,* 527 U.S. 706, 713, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (stating that the phrase "Eleventh Amendment immunity" is a "convenient shorthand but something of a misnomer"); *Hans v. Louisiana,* 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890) ("The letter [of the Amendment] is appealed to now . . . as a ground for sustaining a suit brought by an individual against a State. . . . It is an attempt to strain the Constitution and the law to a construction never imagined or dreamed of."). Two exceptions to the State's sovereign immunity are relevant in this case.

First, Congress may abrogate the State's sovereign immunity by acting pursuant to a grant of constitutional authority under Section Five of the Fourteenth Amendment. *See Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 80, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). Second, a state may waive its Eleventh Amendment defense. *See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999).

 The State argues that neither exception applies here. It relies upon the Supreme Court's decision in *Board of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), to argue that Congress did not validly abrogate the State's immunity against suit because Title II of the ADA and § 504 of the RA exceed Congress' remedial power under Section Five of the Fourteenth Amendment. Before *Garrett,* we had held that Congress acted within the scope of its Fourteenth Amendment enforcement powers, and validly abrogated Eleventh Amendment immunity, in passing Title II of the ADA and § 504 of the RA. *See Clark v. State of California,* 123 F.3d 1267, 1270–71 (9th Cir.1997); *Dare v. State of California,* 191 F.3d 1167, 1173–75 (9th Cir.1999) (discussing the ADA only). In *Garrett,* the Supreme Court held that Congress acted outside the scope of its Section Five powers in enacting Title I (dealing with employment discrimination) of the ADA. *See Garrett,* 531 U.S. at 368–69, 121 S.Ct. 955. But the Court expressly reserved the question of whether Title II(dealing with "services, programs, or activities of a public entity") of the ADA is appropriate legislation under Section Five. *Id.* at 360 n. 1, 121 S.Ct. 955. In light of that reservation, we recently held in *Hason v. Medical Board of California,* 279 F.3d 1167 (9th Cir.2002), that *Clark* and *Dare* are still good law as

to Title *II* of the ADA, and that the Eleventh Amendment does not bar claims against the State brought under Title *II* of the ADA. Thus, we reject the State's argument as to Title II of the ADA.[5]

■ The State also argues that its acceptance of federal RA funds did not constitute a valid waiver of its Eleventh Amendment immunity as to claims under § 504 of the RA. But our decision in *Douglas v. California Department of Youth Authority*, 271 F.3d 812 (9th Cir. 2001), forecloses that argument. In *Douglas*, decided after *Garrett*, we reaffirmed *Clark's* alternative holding that Congress validly conditioned a state's receipt of RA funding on its consent to waive its Eleventh Amendment immunity from suit under § 504 of the RA.[6] *See id.* at 820–21; *see also Vinson v. Thomas*, 288 F.3d 1145, 1151 (9th Cir.2002). It is uncontested that the State accepted federal RA funds.

■ Finally, we reject the State's argument that Congress exceeded its Spending Clause powers and the conditions set forth in *South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987), when it conditioned the receipt of RA funds on a waiver of sovereign immunity. The Act's tying arrangement does not violate *Dole's* "relatedness" requirement and is not unduly coercive. Congress has a strong interest in ensuring that federal funds are not used in a discriminatory manner and in holding states responsible when they violate funding conditions. The term "program or activity" in section 504, moreover, does not encompass all the activities of the State. Instead, it only covers all the activities of the department or the agency receiving federal funds. *See* 29 U.S.C. § 794(b)(1)(A); *Jim C. v. United States*, 235 F.3d 1079, 1082 (8th Cir.2000) (en banc). If a state does not wish to relinquish immunity, it could follow the "simple expedient of not yielding." *Oklahoma v. U.S. Civil Serv. Comm'n*, 330 U.S. 127, 143–44, 67 S.Ct. 544, 91 L.Ed. 794 (1947) (internal quotation marks omitted). There is no showing of the type of "extraordinary circumstances," *California v. United States*, 104 F.3d 1086, 1092 (9th Cir.1997), required by our case law that would allow us to hold that Congress has exceeded constitutional boundaries.

We therefore agree with our sister circuit, *see Jim C.*, 235 F.3d at 1081–82, that the Rehabilitation Act is a valid exercise of Congress's spending power. The Eleventh Amendment is thus not a bar to Lovell and Delmendo's § 504 claims against the State. *See Vinson*, 288 F.3d at 1151; *Douglas*, 271 F.3d at 820–21.

Because we hold that the Eleventh Amendment does not bar Lovell and Delmendo's suits under Title II of the ADA or § 504 of the RA, we need not reach their arguments that the State waived its sover-

---

5. The holding in *Clark* that Congress, acting pursuant to its powers under Section Five of the Fourteenth Amendment, abrogated the state's Eleventh Amendment immunity in enacting the Rehabilitation Act has not yet been reaffirmed after *Garrett's* holding with respect to Title I of the ADA. But given the fact that Title II of the ADA and § 504 of the RA are nearly identical, both in content and remedial provisions, *see infra* Part V, our holding in *Hason* would likely apply to claims brought against states under § 504 of the RA as well. Nevertheless, because we conclude that the State waived its sovereign immunity by accepting RA funds, *see infra*, we need not reach the question whether Congress validly abrogated the states' sovereign immunity under the RA. *See Douglas v. Cal. Dep't of Youth Auth.*, 271 F.3d 812, 819–20 (9th Cir.2001) (making the same observation).

6. The amended Rehabilitation Act provides, "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973." 42 U.S.C. § 2000d–7.

eign immunity by failing to assert the Eleventh Amendment defense until late in the litigation. We turn now to the merits of plaintiffs' claims.

## V. Unlawful Discrimination under the ADA and the RA

The district court granted summary judgment to the *Burns–Vidlak* class on the question of unlawful discrimination under Title II of the ADA and § 504 of the RA, concluding that the plaintiffs had established an unrebutted prima facie case of violations by the State in excluding otherwise qualified disabled persons from the QUEST program on the basis of their disabilities. *See Burns–Vidlak,* 939 F.Supp. at 771–73. The trial court in *Lovell* and *Delmendo* expressly relied on that holding in awarding compensatory damages in the individual actions. The State now challenges the holding that it engaged in unlawful discrimination. We review the grant of summary judgment de novo, using the same standard as the district court. Fed.R.Civ.P. 56(c); *Robi v. Reed,* 173 F.3d 736, 739 (9th Cir.1999).

Title II of the ADA and § 504 of the RA both prohibit discrimination on the basis of disability. The ADA applies only to public entities, whereas the RA proscribes discrimination in all federally-funded programs. Title II of the ADA provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Similarly, the RA provides:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ....

29 U.S.C. § 794(a).

 To establish a violation of Title II of the ADA, a plaintiff must show that (1) she is a qualified individual with a disability; (2) she was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities, and (3) such exclusion or discrimination was by reason of her disability. *See Weinreich v. Los Angeles County Metro. Transp. Auth.,* 114 F.3d 976, 978 (9th Cir.1997). To establish a violation of § 504 of the RA, a plaintiff must show that (1) she is handicapped within the meaning of the RA; (2) she is otherwise qualified for the benefit or services sought; (3) she was denied the benefit or services solely by reason of her handicap; and (4) the program providing the benefit or services receives federal financial assistance. *See id.*

The district court found that there was no material dispute of fact with respect to any of these elements. *See Burns–Vidlak,* 939 F.Supp. at 771. We agree. Since Lovell and Delmendo were part of the certified class—those otherwise eligible for QUEST but denied benefits because of their disabilities—we hold that they established prima facie cases of violations of both Title II of the ADA and § 504 of the RA.

The district court in *Burns–Vidlak* then considered and rejected on the merits three defenses asserted by the State: (1) that plaintiffs were not discriminated against "solely" because of their disabilities but rather on the basis of financial criteria plus their disabilities; (2) that the State's waiver from the HCFA for the QUEST program implicitly exempted it from the anti-discrimination provisions of

the RA and the ADA; and (3) that the "necessity" exception outlined in the Code of Federal Regulations absolved the State of liability. *Id.* at 771–73. The State now asserts a series of defenses to the determinations of unlawful discrimination, some repeated and some new.[7] We consider each of them in turn.[8] Because we find that all of the State's arguments ultimately fail on the merits, we need not reach the issue of whether any of the new arguments were waived due to the State's failure to raise them in the earlier *Burns–Vidlak* district court proceeding.

A. Whether Viewing Hawaii's Medicaid Program as a Whole Alters the Conclusion that the State Categorically Discriminated Against the Disabled

 The State argues, in reliance on 28 C.F.R. § 35.150(a), that a public entity need only operate its programs in such a manner that, when viewed as a whole, they are readily accessible and usable by people with disabilities. The State argues that the district court in *Burns–Vidlak* (and by incorporation, the court in *Lovell* and *Delmendo*) improperly failed to consider its system of healthcare coverage in its entirety and instead wrongly focused solely on the QUEST program. Specifically, the State argues that those disabled people able to qualify financially for the FFS/ABD program received Medicaid benefits. Therefore, according to the State, only those disabled persons unable to qualify financially for the continuing FFS/ ABD program were excluded from Medicaid benefits, and it follows that the true disqualifying criterion was the restrictive income and assets test of the FFS/ABD program rather than the statutory exclusion of the disabled from QUEST.

The State's argument misses the point of plaintiffs' suit. Plaintiffs complain that they were discriminatorily denied benefits in the QUEST program. It is undisputed that disabled people who, but for their disability, were eligible for healthcare benefits from the State under QUEST but could not qualify for the FFS program were denied coverage because of the categorical exclusion of the disabled from QUEST. When viewed in relation to similarly situated nondisabled individuals, those disabled persons were denied QUEST coverage by the State solely because of their disabilities; that is, had they been nondisabled, they would have received QUEST coverage. And it is precisely those disabled people, like Lovell and Delmendo, who comprise the class plaintiffs in *Burns–Vidlak*.

B. Whether the Disabled Had Meaningful Access to Public Benefits After the State Implemented the QUEST Program

 Along similar lines, the State also argues that the continued availability of

---

7. In its pre-trial statement in the *Lovell* proceedings, the State had asked the trial court to issue an order determining whether it would be able to contest the finding of unlawful discrimination under the ADA and RA by the district court on partial summary judgment in the *Burns–Vidlak* action. No such order was ever issued, but the trial court relied on and thereby incorporated the *Burns–Vidlak* finding of unlawful discrimination.

8. The State does not raise the penultimate argument in its briefing for these appeals, but did so in its briefing for *Hirata v. Chandler*, No. 99–15554, 2002 WL 31001837 (9th Cir. Sept. 5, 2002), and *Ho v. Chandler*, No. 99–15670, 2002 WL 31001839 (9th Cir. Sept. 5, 2002), closely related cases arising from the same *Burns–Vidlak* class action. We heard oral argument in all of these cases on the same day, and memorandum dispositions in *Hirata* and *Ho* are being filed contemporaneously with this opinion. Therefore, for the sake of completeness and simplicity, we treat all of the State's defenses in this opinion.

the FFS/ABD program after QUEST was implemented means that it did not deny the disabled "meaningful access" to public benefits. Lovell and Delmendo dispute the use of a "meaningful access" standard in this case. Assuming without deciding that "meaningful access" is the appropriate standard, we find that the State's provision of healthcare benefits violates § 504 of the RA and Title II of the ADA.

According to the State, "the fee for services[FFS] delivery system in which the disabled remained afforded them not only an equal opportunity to obtain quality medical care, but also an opportunity to obtain superior medical care because of the greater choice of physicians available." In making this argument, the State again fails to acknowledge the plight of disabled people such as Lovell, Delmendo, and other members of the *Burns–Vidlak* class: they qualified financially for the QUEST program but were excluded because they were disabled, and they were excluded from participation in the FFS program because they could not qualify financially. That is, the "fees for services [FFS] delivery system in which the disabled remained" was not a system in which Lovell and Delmendo could participate. Some disabled people remained in the FFS program, but Lovell, Delmendo, and similarly situated people did not. The State's appropriate treatment of some disabled persons does not permit it to discriminate against other disabled people under any definition of "meaningful access."

C. Whether The State Was Relieved of the Duty to Include the Disabled in QUEST Because Such Inclusion Would Have "Fundamentally Altered" the QUEST Program

■■■ In *Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir.1996), we explained that

[w]hen a state's policies, practices or procedures discriminate against the disabled in violation of the ADA, Depart-

ment of Justice regulations require reasonable modifications in such policies, practices or procedures "when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would *fundamentally alter* the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

*Id.* at 1485 (emphasis added). The State asserts that there is a material issue of fact as to whether including the disabled in QUEST would have been a reasonable modification or whether such inclusion would have fundamentally altered its program. The State contends that summary judgment on the question of unlawful discrimination was therefore improper.

However, we have held that the fundamental alteration test has no application to cases of facial discrimination, expressly limiting *Crowder's* application of § 35.130(b)(7) to cases of disparate impact discrimination. *See Bay Area Addiction Research & Treatment, Inc. v. City of Antioch ("BAART")*, 179 F.3d 725, 734–35 (9th Cir.1999); *see also MX Group, Inc. v. City of Covington*, 293 F.3d 326, 345(6th Cir.2002). In *BAART*, we reasoned that "[t]he only possible modification of a facially discriminatory law that would avoid discrimination on the basis of disability would be the actual removal of the portion of the law that discriminates on the basis of disability. However, such a modification would fundamentally alter the ordinance." *BAART*, 179 F.3d at 734. Public entities could evade the ADA by claiming it would fundamentally alter their program to eliminate a facially discriminatory provision of a challenged program, and Congress' intent in enacting the ADA would be defeated. *Id.* Because the QUEST program facially discriminates against the disabled, we reject the State's "fundamental alteration" defense, as we did in *BAART*.

D. Whether It Was "Necessary" to Exclude the Disabled from Participation in QUEST

■ The State argues that there was a material issue of fact, sufficient to preclude summary judgment, on whether QUEST's exclusion of otherwise eligible disabled persons and the use of two different delivery systems (FFS/ABD and QUEST) were "necessary" to ensure the financial viability of the State's health care program. Under the implementing regulations, a public entity may provide different or separate benefits under section 504 and Title II if "such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are *as effective as those provided to others*." 28 C.F.R. § 35.130(b)(1)(iv); 28 C.F.R. § 41.51(b)(1)(iv) (emphasis added). Although the State might have believed that it was financially necessary to exclude the disabled from QUEST, the plain language of the regulations prohibits a state from doing so unless it provides them with benefits "as effective as those provided to others." For Lovell, Delmendo, and those similarly situated, the "different or separate" benefit the State provided was no benefit at all. We thus agree with the district court in *Burns–Vidlak* that the State cannot avoid liability under the "necessity" exception.

E. Whether The Supreme Court Has Held That the ADA Does Not Apply to Experimental Programs

■ The State relies on a passage from the Supreme Court's decision in *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999), to argue that Congress did not intend the ADA to apply to experimental Medicaid programs such as QUEST. In *Albertson's,* the Court upheld an employer's right to refuse to employ an ADA plaintiff for his failure to meet a generally applicable federal minimum vision regula-

tion, despite the fact that the plaintiff had obtained permission to participate in an experimental federal vision-safety program that would not have disqualified him for his poor vision. The Court explained:

> The waiver program [in which the plaintiff would participate] was simply an experiment with safety, however well intended, resting on a hypothesis whose confirmation or refutation in practice would provide a factual basis for considering the existing standards. . . . It is simply not credible that Congress enacted the ADA (before there was any waiver program) with the understanding that employers choosing to respect the Government's sole substantive visual acuity regulation in the face of an experimental waiver might be burdened with an obligation to defend the regulation's application according to its own terms.

*Id.* at 576–78 (footnote omitted).

This passage from *Albertson's* cannot support the broad proposition advanced by the State. We read *Albertson's* to say that it does not violate the ADA for a private employer to deny an individual an accommodation based on his participation in an experimental government program when that program does not substantively modify the generally applicable governing regulations. We do not, however, read it to say that experimental programs themselves need not comply with the ADA and RA. We thus reject the State's interpretation.

F. Whether the DHHS Implicitly Excused the State from Complying with the ADA and RA

■ In July 1993, the State received approval for its QUEST program from HCFA, part of DHHS. In conjunction with its approval, HCFA granted the State waivers under 42 U.S.C. § 1315 of certain statutory requirements mandated by 42 U.S.C. § 1396a for "State plans for medi-

cal assistance." The State's proposal revealed the fact that QUEST would not cover the ABD population, but it also indicated that the State would comply with the ADA and the RA. *See Burns–Vidlak,* 939 F.Supp. at 767 & n. 3. The State contends, as it did before the district court in the *Burns–Vidlak* action, that the HCFA waivers for QUEST implicitly excused it from complying with the ADA and the RA.

We disagree. The HCFA waivers upon which the State relies neither could have exempted QUEST from the ADA and the RA, nor purported to do so. Section 1315 authorizes the DHHS to waive various provisions of the Medicaid statute, but it does not mention the ADA or the RA. *See also* 28 C.F.R. § 35.190(b)(3) (charging the DHHS with implementing Title II compliance procedures for programs relating to the provision of health care and social services). Further, even if DHHS did have the authority to waive the ADA and the RA, the State's request to DHHS represented that it would comply with the ADA and the RA. Such a representation can hardly be mistaken for a request for waiver.

## VI. Compensatory Damages

■ The State urges that, even if it did violate the ADA and the RA, there remains a material dispute of fact regarding Lovell and Delmendo's entitlement to compensatory damages. The State argues that, despite its facial exclusion of the disabled from QUEST, it did not "intentionally discriminate" because it acted with "good faith" intentions. We nevertheless affirm the determination that Lovell and Delmendo are entitled to compensatory damages as a matter of law.

■ The same remedies are available for violations of Title II of the ADA and § 504 of the RA. *See* 42 U.S.C. § 12133. The remedies, in turn, are the same as those set forth in Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. *See* 29 U.S.C. § 794a(a)(2); *Ferguson v. City of Phoenix,* 157 F.3d 668, 674 (9th Cir.1998). In accord with Title VI case law, *see Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), "compensatory damages are not available under Title II or § 504 absent a showing of discriminatory intent." *Ferguson,* 157 F.3d at 674; *see also Memmer v. Marin Cty. Courts,* 169 F.3d 630, 633 (9th Cir.1999).

■ In *Duvall v. County of Kitsap,* 260 F.3d 1124(9th Cir.2001), we recently described with some precision the level of intent required to support an award of compensatory damages. In that case, a hearing-impaired litigant sued state court and county personnel under Title II of the ADA and § 504 of the RA for their failure to provide special accommodation in the form of real-time transcription for his hearings. *Id.* at 1129. We held that the "deliberate indifference" standard applies. *Id.* at 1138. "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Id.* at 1139 (citing *City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). The first element is satisfied when the public entity has notice that an accommodation is required. *Id.* The second element is satisfied if the entity's "failure to act [is] a result of conduct that is more than negligent, and involves an element of deliberateness." *Id.* Under the second element, "a public entity does not 'act' by proffering just any accommodation: it must consider the particular individual's need when conducting its investigation into what accommodations are reasonable." *Id.* (footnote omitted).

■ In *Duvall* and the line of cases on which it relies, the public entities had

allegedly failed to provide special accommodations to a disabled person or had sustained policies that allegedly had a disparate impact on the disabled. *See Memmer,* 169 F.3d at 633–34(allegation that a municipal court violated a blind litigant's ADA right by failing to provide special assistance during pre-trial preparation and during the trial itself); *Ferguson,* 157 F.3d at 670 (allegation that city's operation of its 9–1–1 emergency service had discriminatory impact on the hearing-impaired under Title II and § 504); *see also Guardians,* 463 U.S. at 598, 103 S.Ct. 3221(finding, in a suit based on the city police department's "last-hired, first-fired" policy, that discrimination "resulted from the *disproportionate impact* of the entry-level tests on racial ʻminorities" but that "proof of *discriminatory impact* does not end the matter") (emphasis added). In contrast, this case involves *facial discrimination,* in the form of a categorical exclusion of disabled persons from a public program. In such a case, the public entity is, at the very least, "deliberately indifferent"; by its very terms, facial discrimination is "intentional." *See Pandazides v. Va. Bd. of Ed.,* 13 F.3d 823, 830 n. 9 (4th Cir.1994) (reasoning that because "intentional discrimination" was "synonymous with discrimination resulting in ʻdisparate treatment,' which contrasts with disparate impact," no greater proof of mental state was necessary) (citing *Guardians,* 463 U.S. at 584 n. 2, 103 S.Ct. 3221 (opinion of White, J.)).

▬ Applying the *Duvall* standard in this context, we find that the State acted with "deliberate indifference," and therefore engaged in "intentional discrimination." First, when a state facially discriminates against the disabled, it is chargeable with notice that federal rights are implicated by such discrimination. Thus, Hawaii had notice that a modification was required. Second, by choosing categorically to exclude disabled persons from QUEST,

despite knowing that some of those excluded would remain without any coverage, the State has failed to act with the requisite care to protect the rights of the disabled.

Our finding of intentional discrimination in this case does not interfere with the purpose of the statutory limitation on compensatory damages. The Supreme Court has said that the purpose of requiring proof of intent as a prerequisite for the recovery of monetary damages from a public entity is to ensure that the entity had knowledge and notice. The purpose is not to measure the degree of institutional ill will toward a protected group, or to weigh competing institutional motives. *See Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 287–89, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (finding notice to the school district indispensable before it can be held financially liable under Title IX for a teacher's sexual harassment of a student, but not requiring active approval of such harassment); *Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 74, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) ("The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award."); *Guardians,* 463 U.S. at 598, 103 S.Ct. 3221(explaining that monetary recovery under Title VI requires proof of intent so that the court can be sure that the recipient of the Title VI funds had knowledge of the violation and could have chosen to refuse the federal funds rather than face liability).

By categorically excluding all disabled persons from QUEST, the State had knowledge of its own facially discriminatory conduct and notice of the effects of its conduct on Lovell, Delmendo, and similarly situated disabled people. In so discriminating, and in failing to alleviate the impact of this discrimination on the disabled

who remained without any coverage, the State acted with at least deliberate indifference. Accordingly, regardless of the State's asserted long-term motivations or competing interests, we conclude that the State's facial exclusion of the disabled from QUEST entitles Lovell and Delmendo to compensatory damages as a matter of law.

### VII. Expert Witness Fees

■ The State concedes that Lovell and Delmendo are entitled to attorneys' fees, costs, and prejudgment interest if we affirm (as we do) the determinations of unlawful discrimination and the award of compensatory damages. However, the State objects to the trial court's decision to allow expert witness fees of more than $40 per day as part of its award of costs in both actions. In the State's view, reimbursement for expert fees should be limited to $40 pursuant to 28 U.S.C. §§ 1821(b) and 1920(3). Fee awards are reviewed for an abuse of discretion, although the choice of legal standard is a question of law reviewed de novo. *See Siegel v. Fed. Home Loan Mortgage Corp.*, 143 F.3d 525, 528 (9th Cir.1998).

■ Absent "express statutory authority" for shifting expert witness fees, reimbursement for such fees is limited by §§ 1821(b) and 1920(3). *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 439, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). The ADA authorizes a court to award attorneys' fees, litigation expenses, and costs to a prevailing party. *See* 42 U.S.C. § 12205; *see also* 28 C.F.R. § 35.175. The preamble to the ADA Title II regulations explains that "[l]itigation expenses include items such as expert witness fees, travel expenses, etc." 28 C.F.R. Pt. 35, App. A, Section–by–Section Analysis, § 35.175. This construction of the statute is consistent with its legislative history. According to committee reports, Congress included the term "litigation ex-

penses" in order to authorize a court to shift costs such as expert witness fees, travel expenses, and the preparation of exhibits. *See* H.R. Rpt. No. 101–485(III) at 73, *reprinted in* 1990 U.S.C.C.A.N. 445, 496 (Report of the Committee on the Judiciary) ("Litigation expenses include the costs of expert witnesses. This provision explicitly incorporates the phrase 'including litigation expenses' to respond to rulings of the Supreme Court that items such as expert witness fees, travel expenses, etc., be explicitly included if intended to be covered under an attorney's fee provision."); H.R. Rpt. No. 101–485(II) at 140, *reprinted in* 1990 U.S.C.C.A.N. 303, 423 (Report of the Committee on Education and Labor) ("Litigation expenses include the costs of experts and the preparation of exhibits.").

■ The State argues that the term "litigation expenses" in 42 U.S.C. § 12205 is too vague to authorize the district court to shift expert fees to the prevailing party and that regulations do not amount to the sort of "express statutory authority" required by *Crawford*. We disagree. First, because the term "litigation expenses" normally encompasses expert witness fees, we hold that the statutory provision provides direct authority for the award of expert witness fees. Second, because Congress gave the Attorney General the authority to promulgate regulations under the ADA, 42 U.S.C. § 12134(a), those regulations "must be given legislative and hence controlling weight unless they are arbitrary, capricious, or clearly contrary to the statute." *Does 1–5 v. Chandler*, 83 F.3d 1150, 1153 (9th Cir.1996) (quoting *United States v. Morton*, 467 U.S. 822, 834, 104 S.Ct. 2769, 81 L.Ed.2d 680 (1984)). Therefore, even assuming that the term "litigation expenses" is too ambiguous to serve as "explicit statutory authority" for shifting expert witness fees, we must still defer to

the interpretive regulations. The Attorney General's construction is not arbitrary, capricious, or contrary to the statute. We therefore affirm the trial court's awards of expert witness fees to Lovell and Delmendo.

### Conclusion

For the foregoing reasons, we AFFIRM the judgments in *Lovell* and *Delmendo* in their entirety.