# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2014NE

_____

John Doe; Mary Doe, Individually and &ast;
as Husband and Wife, and; JNT, by &ast;
and through John Doe, his next friend; &ast;
Jay Brummett, Personal Representative &ast;
of the Estate of GayLynn Brummett, &ast;
&ast;
  Plaintiffs - Appellees, &ast;
&ast;
United States of America, &ast;
&ast;
  Intervenor - Appellee, &ast;
&ast;
  v. &ast;
&ast; On Appeal from the United
&ast; States District Court
The State of Nebraska; Department of &ast; for the District of
Health and Human Services; Michael &ast; Nebraska.
Johanns, Governor of the State of &ast;
Nebraska, in his official capacity; &ast;
Ron Ross, Director of the Nebraska &ast;
Department of Health & Human &ast;
Services, in his official capacity; &ast;
Sandy Thompson, Child Protective &ast;
Services Case Manager for the &ast;
Nebraska Department of Health & &ast;
Human Services, in her official &ast;
capacity; Patricia Squires, Deceased, &ast;
Child Protective Services Supervisor &ast;
and Adoption Unit Supervisor for the &ast;
Nebraska Department of Health & &ast;
Human Services, in her official &ast;
capacity; Daryl Wusk, Administrator &ast;

of the Lincoln District Office of the          *
Nebraska Department of Health &                *
Human Services, in his official                *
capacity,                                      *
                                               *
          Defendants - Appellants.             *
                                      _____

Submitted:  January 15, 2003
Filed:  October 7, 2003
                                      _____

Before BOWMAN, RICHARD S. ARNOLD, and BYE, Circuit Judges.
                                      _____

RICHARD S. ARNOLD, Circuit Judge.

GayLynn Brummett, through her estate, and Noah Brummett, a child adopted by Jay Brummett and GayLynn,[1] sued the State of Nebraska, the Nebraska Department of Health and Human Services, and various state officials (collectively the defendants or Nebraska) for damages under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  The defendants moved for summary judgment on the § 504 claim on the basis that they are immune from suit under the Eleventh Amendment of the United States Constitution.  The District Court[2] denied the motion, and this interlocutory appeal followed.  We affirm.

_____

[1]The plaintiffs filed this discrimination case under pseudonyms.  The plaintiffs now state in their brief that they no longer wish to be protected by the pseudonyms.  Accordingly, we will use their real names.

[2]The Hon. Warren K. Urbom, Senior United States District Judge for the District of Nebraska.

I.

Jay and GayLynn were married in 1989. The following year, they discovered that GayLynn had contracted HIV, the virus that causes AIDS. Because they wanted children but did not want to risk infecting Jay or a child during conception or gestation, the Brummetts decided to enroll in a foster-parenting program administered by the Nebraska Department of Social Services (NDSS).[3] The Brummetts met the requirements for participating in the program, but they did not inform NDSS about GayLynn's HIV status. After serving as temporary foster parents to several children, the Brummetts decided they wanted to adopt a child and enrolled in the NDSS's "fos-adopt" program. NDSS placed two children with the Brummetts as fos-adopt placements. NDSS placed S.S. with the Brummetts in September 1991, and placed Noah, a three-month old, with the family on March 27, 1992.

On June 2, 1993, nine months after receiving a confidential complaint, NDSS officials confronted GayLynn about her HIV status. At that time, she admitted that she was HIV-positive. A month later, after Noah's biological parents relinquished their parental rights, the Brummetts signed an adoption placement agreement for Noah with NDSS. Shortly thereafter, NDSS officials met several times about the placement of S.S. and Noah with the Does. S.S. was removed from the home in early August 1993 and placed with his relatives. NDSS officials then solicited medical and legal advice about removing Noah from the home. After lengthy administrative and legal proceedings, a county court approved an NDSS plan to remove Noah from the home. Noah was placed with another family on June 25, 1995. Noah's statutory guardian ad litem appealed this ruling, and the Nebraska Court of Appeals reversed

---

[3]Since this lawsuit was commenced, the State of Nebraska has reorganized several of its agencies, including NDSS. As a result of this reorganization, NDSS is no longer in existence, and its functions are now included within the Nebraska Department of Health and Human Services. See Appellant's Br. 4 n.1. For the sake of clarity, however, we will refer to this agency as NDSS.

the holding of the county court, finding that Noah's best interests would be served by being returned to the Brummetts. The Nebraska Supreme Court refused to hear NDSS's appeal of that decision. NDSS then submitted a new plan to the county court, recommending that Noah's current fos-adopt parents adopt him. The court adopted that plan. In response, the Brummetts filed a petition with the Nebraska Supreme Court, which issued a writ of mandamus ordering the county court to comply with the appeals court's ruling. On February 22, 1996, Noah was returned to the Brummetts. Approximately eight months later, the Brummetts filed with the county court a petition for adoption and name change, which was accompanied by a consent of the NDSS. The day after this filing, GayLynn died from complications related to AIDS. On November 26, 1996, the county court entered a decree of adoption naming the Brummetts the adoptive parents of Noah.

The plaintiffs filed this suit in November 1995. Although the complaint initially involved multiple causes of action, the claims have since been limited to a suit for damages under § 504 by GayLynn's estate and Noah against the State of Nebraska, NDSS, and various state officials sued in their official capacities. In short, the plaintiffs allege that the defendants violated § 504 by excluding GayLynn, because of her HIV status, from participating in Nebraska's foster care and adoption programs. See, e.g., Complaint ¶¶ 60–64 (filed Nov. 8, 1995).

In January 1998, the defendants moved for summary judgment on the § 504 claim on the ground that they are immune from suit under the Eleventh Amendment. The District Court denied the motion, holding, inter alia, that the defendants had waived their sovereign immunity, pursuant to the waiver provision of § 504, 42 U.S.C. § 2000d-7, by accepting federal funds for their foster care and adoption programs. The defendants filed an interlocutory appeal from this order, and the United States intervened on appeal to defend the waiver provision. We stayed consideration of that appeal pending our decision in Jim C. v. United States, 235 F.3d 1079 (8th Cir. 2000) (en banc), cert. denied, 533 U.S. 949 (2001). Following our

decision in Jim C., a three-judge panel of our Court issued an unpublished opinion in the present case vacating the District Court's decision as to the § 504 claim and remanding the case for reconsideration in light of Jim C. Doe v. Nebraska, No. 99-1024 (8th Cir. Apr. 17, 2001).[4] On remand, the defendants renewed their motion for summary judgment, arguing that the state of Nebraska had been coerced into waiving its Eleventh Amendment immunity by the federal government's conditioning receipt of federal funding for their foster care and adoption programs on Nebraska's waiver of immunity to suit under § 504. The defendants also argued, relying on Garcia v. S.U.N.Y. Health Sciences Center, 280 F.3d 98 (2d Cir. 2001), that their waiver of sovereign immunity is invalid because they mistakenly believed Congress had already abrogated such immunity, and therefore they did not knowingly waive their Eleventh Amendment immunity. The District Court rejected both arguments, and denied the motion for summary judgment.

## II.

We review de novo the question of whether a state (or its agencies and officials) has waived sovereign immunity. Santee Sioux Tribe v. Nebraska, 121 F.3d 427, 430 (8th Cir. 1997), cert. denied, 525 U.S. 813 (1998).

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Eleventh Amendment provides states, and state agencies, see Hadley v. North Ark. Cmty. Technical Coll., 76 F.3d 1437, 1438 (8th Cir. 1996), cert. denied, 519 U.S. 1148

---

[4]In that decision, we also reversed the District Court's judgment as to the claims under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12213, and dismissed those claims.

(1997), with immunity not only from suits brought by citizens of other states, but also from suits brought by their own citizens. Hans v. Louisiana, 134 U.S. 1, 15 (1890). Eleventh Amendment immunity, however, is not absolute. The Supreme Court has recognized, among other exceptions, that a state may waive its sovereign immunity by consenting to suit. Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670 (1999).

A state may waive its immunity either by explicitly specifying its intention to subject itself to suit or by voluntarily participating in federal spending programs where Congress expressed a clear intent to condition receipt of federal funds on a state's consent to waive its sovereign immunity. Atasacadero State Hosp. v. Scanlon, 473 U.S. 234, 238 n.1 (1985) ("A state may effectuate a waiver of its constitutional immunity by . . . waiving its immunity to suit in the context of a particular federal program."). A waiver of Eleventh Amendment immunity as a condition of the receipt of federal funds should be found "only where stated 'by the most expressive language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.' " Edelman v. Jordan, 415 U.S. 651, 673 (1974) (quoting Murray v. Wilson Distilling Co., 213 U.S. 151, 171 (1909)) (alteration by Edelman Court).

Under the Rehabilitation Act, states that accept federal funds are required by statute to waive their Eleventh Amendment immunity to § 504 claims. 42 U.S.C. § 2000d-7 ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act . . . or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance."); see Jim C., 235 F.3d at 1081; Koslow v. Pennsylvania, 302 F.3d 161, 170 (3d Cir. 2002) (detailing the origin of § 2000d-7 and noting that by enacting that provision "Congress put states on notice that by accepting federal funds under the Rehabilitation Act, they would waive their Eleventh Amendment immunity" to § 504

claims), cert. denied, 123 S. Ct. 1353 (2003). As we stated in Jim C., this waiver of sovereign immunity is limited and applies only to the individual agency that receives the federal funds, i.e., a state can avoid waiver by "accepting federal funds for some departments and declining them for others." 235 F.3d at 1081.

In this case, as in Jim C., the defendants argue that they did not voluntarily consent to suit because the financial inducement offered by Congress for Nebraska's social-services programs administered by NDSS was so great that Nebraska had no choice but to accept the federal funding and waive its immunity to suit under § 504. We disagree.

NDSS receives both state and federal funding. Nebraska state law authorizes NDSS to apply for and accept federal grants. Neb. Rev. Stat. § 81-3102(7). The federal grants received by NDSS vary in amount, and the percentage of any particular NDSS program subsidized by the federal government also varies from time to time and from one program to another. According to the defendants, "[h]istorically, the federal funding component of the [NDSS] budget on both [an] appropriation basis, with anticipated federal funding, and on an actual basis, is generally no less than **60%**." Appellants' Br. at 10–11. The defendants also state that "the federal funding component was no less than **60%** of [NDSS's] operating budget" in the years 1990 to 1995 and that the "specific programs which would have provided assistance to . . . [Noah Brummett], mirror this **60%**, both as to budget and as to actual expenditures." Id. at 11. In the year the Does filed this suit, 1995, the federal funding component of the NDSS's expenditures, $557 million, constituted approximately 18.59% of Nebraska's total expenditures for that year. Ibid.

In Jim C., we held that Arkansas waived its sovereign immunity to suit for § 504 claims against the Arkansas Department of Education when it chose to accept federal funds for that department. 235 F.3d at 1080. In so doing, we disagreed with a panel decision that found § 504 was not a valid exercise of Congress's power under

the Spending Clause because the conditions Congress imposed on the states were too broad and therefore coercive. Ibid. (holding Congress validly exercised its power under the Spending Clause by conditioning receipt of federal funds on a state agency's waiver of its Eleventh Amendment immunity to § 504 claims), vacating Bradley ex rel. Bradley v. Ark. Dep't of Educ., 189 F.3d 745, 757–58 (8th Cir. 1999).[5] Notably, in Jim C. we rejected Arkansas's coercion argument, concluding that "[t]he sacrifice of all federal education funds, approximately $250 million or 12 per cent. of the annual state education budget . . . would be politically painful, but we cannot say that it compels Arkansas's choice." 235 F.3d at 1082. In this case, the defendants contend that coercion is readily apparent because the federal funding component for NDSS's budget, both on an appropriation and on an actual basis, was no less than sixty per cent. between 1990 to 1995 and amounted to $557 million in 1995 alone.

While the Supreme Court in South Dakota v. Dole acknowledged that federal financial inducement offered to the states could become coercive, the Court also observed that states voluntarily exercise their own choice in accepting the conditions attached to the receipt of federal funds. 483 U.S. 203, 211–12 (1987) (noting that "not merely in theory but in fact," states decide whether to enact laws setting a higher minimum drinking age in exchange for federal highway funds). We are not aware of, nor did the defendants direct us to, any decision supporting their contention that the level and amount of funding at issue here constitutes impermissible coercion. As noted previously, we have found no coercion where a similarly large amount of federal money was at stake. Jim C., 235 F.3d at 1082. Other circuits are in accord with this view. See Lovell v. Chandler, 303 F.3d 1039, 1051 (9th Cir. 2002) (citing Jim C. with approval in § 504 case), cert. denied, 123 S. Ct. 871 (2003); Kansas v. United States, 214 F.3d 1196, 1202 (10th Cir.) (holding that conditioning of $131.2

---

[5]We also left intact the holding of the panel that Congress exceeded its authority under Section 5 of the Fourteenth Amendment in extending § 504 to the states. Jim C., 235 F.3d at 1080.

million in federal funds on Kansas's acceptance of certain federal requirements does not constitute impermissible coercion), cert. denied, 531 U.S. 1035 (2000); see also West Virginia v. United States Dep't of Health & Hum. Servs., 289 F.3d 281, 289 (4th Cir. 2002) (observing that there has been "no decision from any court finding a conditional grant to be impermissibly coercive"); Nevada v. Skinner, 884 F.2d 445, 448 (9th Cir. 1989), cert. denied, 493 U.S. 1070 (1990).

Nothing in the facts of this case requires us to deviate from our holding in Jim C. Nebraska applied for and received federal grants for its social-service programs. As a condition of NDSS's receiving federal funding for these programs, Nebraska agreed to waive its Eleventh Amendment immunity to discrimination claims under § 504. As in Jim C., Nebraska could have avoided the requirements of § 504 by declining the federal funds. While the amount of federal funding at issue here is significant, we cannot conclude that Nebraska's decision to accept the money was impermissibly coerced. Nebraska was free to "take the money or leave it." Jim C., 235 F.3d at 1082; see also Kansas, 214 F.3d at 1203 ("[A] difficult choice remains a choice, and a tempting offer is still but an offer. If Kansas finds the . . . requirements so disagreeable, it is ultimately free to reject both the conditions and the funding, no matter how hard that choice may be."). Moreover, Nebraska retains the ultimate control, through its state legislative process, to determine the amount of federal funds allocated to any particular agency and the responsibilities of that agency. If Nebraska wanted to avoid the requirements of § 504, it could have transferred the adoption and foster-care programs out of NDSS to another agency that did not receive federal funding. See Jim C., 235 F.3d at 1081 ("A State and its instrumentalities can avoid Section 504's waiver requirement on a piecemeal basis, by simply accepting federal funds for some departments and declining them for others."); Lovell, 303 F.3d at 1051 (noting that § 504 "only covers all the activities of the department or the agency receiving federal funds," not all the activities of the state).

III.

Relying on the Second Circuit's decision in Garcia, the defendants also argue that Nebraska did not knowingly waive its Eleventh Amendment immunity at the time the state accepted federal funds. As we have said, a state may waive its Eleventh Amendment immunity by making "a 'clear declaration' that it intends to submit itself" to federal court jurisdiction. Coll. Sav. Bank, 527 U.S. at 676 (quoting Great Northern Life Ins. Co. v. Read, 322 U.S. 47, 54 (1944)). This test for waiver is stringent. Id. at 675. An effective waiver of sovereign immunity requires an "intentional relinquishment or abandonment of a known right or privilege." Id. at 682 (citation to quoted case omitted). In assessing whether there has been a knowing waiver of sovereign immunity, courts must " 'indulge every reasonable presumption against waiver' of fundamental constitutional rights." Id. (quoting Aetna Ins. Co. v. Kennedy ex rel. Bogash, 301 U.S. 389, 393 (1937)).

In enacting Title II of the ADA, Congress clearly expressed its intent to abrogate state sovereign immunity. See 42 U.S.C. § 12202 (2000) ("A State shall not be immune under the [E]leventh [A]mendment to the Constitution of the United States from an action in Federal or State court . . . for a violation of this chapter." (footnote omitted)). The abrogation/waiver provision of § 504 contains nearly identical language. See 42 U.S.C. § 2000d-7(a)(1) ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act . . . or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance."). The abrogation provision of the ADA, however, has since been called into serious doubt. In 2001, the Supreme Court in Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356, 360 (2001), held that Congress did not validly exercise its Section 5 enforcement powers under the

Fourteenth Amendment[6] in seeking to abrogate state sovereign immunity under Title I of the ADA. Similarly, before the Supreme Court decided Garrett, we held in Alsbrook v. City of Maumelle, Ark., 184 F.3d 999, 1010 (8th Cir. 1999) (en banc), cert. dismissed, 529 U.S. 1001 (2000), that Title II of the ADA "was not a proper exercise of Congress's power under Section 5 of the Fourteenth Amendment" and therefore did not abrogate Eleventh Amendment immunity. Following our decision in Alsbrook and again before the Supreme Court decided Garrett, we held in Bradley that § 504 was not a valid exercise of Congress's power under the Fourteenth Amendment to abrogate state sovereign immunity, 189 F.3d at 756, a holding that was not disturbed by our en banc decision in Jim C., 235 F.3d at 1080.

Nebraska argues that prior to these decisions, it had no reason to doubt the validity of Congress's asserted abrogation of state sovereign immunity under the ADA or § 504. Thus, according to the defendants, they could not know that they retained any sovereign immunity to waive under § 2000d-7 because they would have been justified in a belief that Nebraska's immunity from suit had already been abrogated by Congress under Title II when it accepted Rehabilitation Act funds for NDSS from roughly 1993 to 1996. In support of this claim, Nebraska cites the Second Circuit's decision in Garcia. While the court in Garcia held that § 2000d-7 constitutes a clear conditional waiver, it also held that New York did not knowingly waive its Eleventh Amendment immunity from § 504 claims when it accepted federal funds for its medical school. Garcia, 280 F.3d at 113–15. In reaching this conclusion, the court reasoned that "[a]t the time that New York accepted the conditioned funds, Title II

---

[6]"Section 5 of the Fourteenth Amendment grants Congress the power to enforce the substantive guarantees contained in [Section 1 of the Fourteenth Amendment] by enacting 'appropriate legislation.' " Garrett, 531 U.S. at 365 (quoting City of Boerne v. Flores, 521 U.S. 507, 536 (1997)). Section 1 of the Fourteenth Amendment provides, in part: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

of the ADA was reasonably understood to abrogate New York's sovereign immunity under Congress's Commerce Clause authority." Ibid. Accordingly, the court determined that because "the proscriptions of Title II and § 504 are virtually identical," the State of New York had not knowingly waived its Eleventh Amendment immunity against § 504 claims because it appeared such immunity "had already been lost." Id. The Second Circuit distinguished our decision in Jim C. on the issue of whether a state knowingly waived its right to sovereign immunity because, in its view, we focused "exclusively on whether Congress clearly expressed its intention to condition waiver on the receipt of funds and whether the state in fact received the funds," i.e., we did not address whether accepting conditioned funds constitutes a knowing waiver of sovereign immunity. Id. at 115 n.5.

Since Garcia was decided, some other courts have adopted its reasoning. See Pace v. Bogalusa City Sch. Bd., 325 F.3d 609, 617 (5th Cir. 2003) (holding defendants "did not knowingly waive their immunity by accepting federal IDEA [Individual with Disabilities Act] funds" because at the time they accepted such funds" no circuit court had held that § 1403 of the IDEA did not validly abrogate state sovereign immunity"); Garrett v. Univ. of Ala. Bd. of Trustees, 223 F. Supp. 2d 1244, 1249 (N.D. Ala. 2002) ("This court finds Garcia well reasoned and persuasive."); A.A. v. Bd. of Educ., Cent. Islip Union Free Sch. Dist., 196 F. Supp. 2d 259, 265 (E.D.N.Y. 2002) (holding New York's acceptance of federal funds cannot abrogate the state's immunity from damages for violations of § 504 because the funds were accepted years before the state "could have known that the ADA did not validly abrogate the Eleventh Amendment"). But see Koslow, 302 F.3d at 172 n.12 (declining in dicta to adopt Garcia analysis); Shepard v. Irving, 204 F. Supp. 2d 902, 917 (E.D. Va. 2002) (rejecting "knowing waiver" argument because defendant "knew that it was exposing itself to suit for actions under the Rehabilitation Act if it received federal funds").

In our view, the State's argument is not well taken. In the first place, the State of Nebraska had reason to know that the ADA's abrogation clause might be found unconstitutional. We are, after all, dealing with a sovereign state, not an indigent, uncounseled criminal defendant. The State of Nebraska, which here seeks to avoid its agreement, is well supplied with lawyers and funds. It is not unreasonable to expect such a party to inform itself as to the state of the law. Given this reasonable expectation, we cannot accept the argument that Nebraska had no reason to doubt the validity of Congress's asserted abrogation of state sovereign immunity under the ADA or § 504. It is true that between 1993 and 1996, the relevant time period for this case, the Supreme Court had not yet declared the abrogation clause of the ADA invalid. That did not occur until the Supreme Court decided Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356, 364 (2001). At the same time, neither this Court nor the Supreme Court had held that the abrogation clause found in the ADA was constitutional. We conclude that the combination of the dearth of precedent on the validity of the ADA's abrogation clause and general legal developments on the question of congressional abrogation of sovereign immunity gave any reasonable litigant reason to wonder whether the abrogation clause would withstand a constitutional challenge.

The law was quite unsettled at the relevant time as to whether Congress could use its power to regulate commerce to abrogate sovereign immunity. In 1989, the Supreme Court ruled on the issue in Pennsylvania v. Union Gas Co., 491 U.S. 1 (1989), but there were so many opinions with such varied reasoning that the question of the validity of Congress's power to abrogate sovereign immunity under the Commerce Clause remained in flux. In 1996, the Supreme Court definitively answered the question in Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996), concluding that the Commerce Clause did not give Congress the power to abrogate sovereign immunity. As the Supreme Court recounts in that opinion, that case had been ongoing since September of 1991. Ibid. at 51. The Court of Appeals for the Eleventh Circuit had ruled on the issue on January 18, 1994, concluding that

Congress lacked the power to abrogate a state's sovereign immunity under the Indian Commerce Clause. Seminole Tribe of Florida v. Florida, 11 F.3d 1016 (11th Cir. 1994). Thus, when the State of Nebraska was accepting federal funds under the Rehabilitation Act between 1993 and 1996, there was a live debate in the legal community on the question of whether Congress could abrogate a state's sovereign immunity under the Commerce Clause.

That being said, at the time the ADA's abrogation clause also purported to rest on Congress's power to enforce the protections of the Fourteenth Amendment. See Bd. of Trustees of University of Alabama v. Garrett, 531 U.S. 356, 364 n.3 (2001). This fact hardly changes matters, however, as it has long been established that Congress's power under § 5 is limited. In Katzenbach v. Morgan, the Supreme Court indicated that, although Congress's power to enforce the Fourteenth Amendment included power to go beyond the Amendment's text, the enforcement power was not unlimited — § 5 allows Congress to enact "appropriate legislation to enforce the Equal Protection Clause." 384 U.S. 641, 650 (1966). This language seemed to indicate that Congress's power to enforce the Fourteenth Amendment applied only where there was a potential equal protection violation. And by the middle of the 1990's (the time period relevant to this case), federal courts were beginning to place tighter limits on Congress's power under § 5. See City of Boerne v. Flores, 521 U.S. 507 (1997) (recounting that the district court had ruled the Religious Freedom Restoration Act unconstitutional in early 1995).

In light of this precedent, the validity of the ADA as a § 5 enactment was far from clear when Nebraska accepted Rehabilitation Act funds in 1996. The Supreme Court had already decided that disabled persons were not a specially protected class under the Equal Protection Clause. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 442-47 (1985). Indeed, the Court said that the treatment of the disabled was "a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary." Id. at 443. In light of this approach, and the

-14-

tightening standards for § 5 legislation, by the mid-1990's there was certainly reason to regard the validity of the ADA as a § 5 enforcement statute as a debatable issue.

We are not holding that Nebraska should have known that the abrogation clause in the ADA was invalid, but only that there was reason to question it and to consider the possibility that the abrogation clause would ultimately prove ineffective. It is also interesting to note the total lack of factual support for the state's argument. The record is utterly devoid of evidence that any of the attorneys employed by Nebraska ever thought that, by accepting funds, Nebraska would not actually lose anything in light of the ADA's abrogation clause. Did any of the lawyers actually say to themselves, "Well, the abrogation statute is there, so we may as well sign the waiver, because in doing so we give up nothing"? Did any of the lawyers actually mention anything of this kind to their client? The State's brief never even argues that such a thing happened. In addition, we have no idea what the State would have done if it had known that the abrogation clause was going to be declared invalid. Would it have refused the funds? The State does not say so. Would it have accepted the funds and waived immunity anyway? We are not told this either.

Even if one accepts the assumption that Nebraska was actively considering the existence of the abrogation clause in the ADA, Nebraska's acceptance of the funds is best understood as something like an insurance policy that the federal government was buying--it was getting Nebraska to waive its immunity just in case the congressional abrogation in the ADA was invalid. Indeed, the very fact that Congress thought it necessary to provide two grounds for overcoming sovereign immunity should have raised the State's suspicion that Congress was not entirely confident of either.

Finally, the result advocated by the State would do violence to elementary and well established principles of contract law. A basic purpose of a contract is to allocate risks among parties. Generally, those who make contracts are bound by their

agreement, even if they're incorrect about the facts (except in the case of mutual mistake) or the law.  In general, a mistake of law will not be relieved against. Contracting parties rarely, if ever, make their agreements with full knowledge of every relevant fact and every relevant consideration of law.  Instead, it is the office of the contract to allocate the risks of error between the parties.  See Restatement (2d), Contracts § 154 (1981) ("a party bears the risk of a mistake when . . . (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient . . ..").  There is nothing harsh about holding the State to this ordinary principle, especially since, as we have attempted to demonstrate, the validity of the statutory abrogation clause was very much a live issue at the time the waiver was signed.

Moreover, we wonder about the remedy that would result.  Apparently Nebraska would get to keep all the benefits of its bargain.  Certainly it has not offered to return any of the money it received.  Is this not a remedy unknown to the law of contracts?  Even in the case of a mutual mistake, the remedy is to avoid the contract, thereby relieving both parties of their duties of performance.  Restatement (2d), Contracts § 152; id. at Chapter 6 Introductory Note ("a party wishing to exercise a power of avoidance will usually simply notify the other party of his rescission, offering to return what he has received or the equivalent.").  This remedy is likewise unknown in constitutional jurisprudence.  Take the example of a plea bargain.  The government gives up its right to try the defendant on a more serious charge, and the defendant, by pleading guilty, gives up the right to a trial, and other assorted rights, with respect to remaining charges.  If the defendant later seeks to avoid his plea by asserting that he accepted the agreement without having been fully informed of his rights, the plea can be avoided.  But the government regains what it gave up in the agreement, its right to try the defendant, even on the dismissed charges.  Thus, the parties are put back in their initial position.  Here, however, the result would be quite

different. Nebraska would simply keep the money. Such a remedy seems to us foreign to both contract and constitutional law.

We conclude that the State of Nebraska ought to have known, in 1996, that the validity of the abrogation statute was an issue litigable in good faith. Its decision to waive immunity by contract — an adequate and independent way of eliminating the Eleventh Amendment defense — was therefore knowing. The State should be held to its agreement.

Affirmed.

BOWMAN, Circuit Judge, dissenting.

I respectfully dissent. While I agree with the Court's decision that the State of Nebraska, the Nebraska Department of Health and Human Services, and various state officials (collectively, the defendants or Nebraska) were not coerced into waiving their Eleventh Amendment immunity, I would reverse the District Court's decision because the defendants did not knowingly waive their Eleventh Amendment immunity at the time Nebraska accepted federal funds for its foster care and adoption programs.

The Court accurately notes that the Supreme Court has said that an Eleventh Amendment waiver by a state must be clear, knowing, and intentional, see ante at 10 (citing Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675–76 (1999)), and that in assessing whether there has been a knowing waiver of sovereign immunity, courts must "'indulge every reasonable presumption against waiver' of fundamental constitutional rights," Coll. Sav. Bank, 527 U.S. at 682 (quoting Aetna Ins. Co. v. Kennedy ex rel. Bogash, 301 U.S. 389, 393 (1937)). The opinion of the Court, however, is not faithful to these teachings. Instead, the opinion merely pays lip service to the Supreme Court's admonition that we must indulge every

-17-

reasonable presumption against waiver. In reality, the Court indulges every presumption *in favor* of finding a waiver by Nebraska of its Eleventh Amendment immunity.

Nebraska argues, and I agree, that prior to our 1999 decisions in Alsbrook v. City of Maumelle, Arkansas, 184 F.3d 999 (8th Cir. 1999) (en banc) (Title II of the ADA), and Bradley v. Arkansas Department of Education, 189 F.3d 745 (8th Cir. 1999) (§ 504) (subsequent history omitted), and the Supreme Court's 2001 decision in Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356 (2001), the state had no reason to doubt the validity of Congress's asserted abrogation of state sovereign immunity under the ADA or § 504. See ante at 10–11 (discussing Congress's intent to abrogate state sovereign immunity in Title II of the ADA and § 504 of the Rehabilitation Act and acknowledging our decisions that the abrogation clauses in those acts were not valid exercises of Congress's power under § 5 of the Fourteenth Amendment). The defendants could not know that they retained any sovereign immunity to waive under § 2000d-7 because they would have been justified in their belief that Nebraska's immunity from suit had already been abrogated by Congress under Title II when the state accepted Rehabilitation Act funds from roughly 1993 to 1996. See Garcia v. S.U.N.Y. Health Sciences Ctr., 280 F.3d 98, 113–15 (2d Cir. 2001), discussed by the Court ante at 11–12. Consistent with the decisions of the Second Circuit and other courts (cited by the Court ante at 12) that have recently addressed this issue, I would hold that Nebraska did not knowingly waive its Eleventh Amendment immunity by accepting Rehabilitation Act funds because, at the pertinent time the state accepted those funds, it had no reason to doubt the validity of Congress's abrogation of its Eleventh Amendment immunity under § 504. Simply put, the defendants "did not know that they retained any sovereign immunity to waive." Pace v. Bogalusa City Sch. Bd., 325 F.3d 609, 617 (5th Cir.), reh'g en banc granted, 339 F.3d 348 (5th Cir. 2003); cf. Douglas v. Cal. Dep't of Youth Auth., 285 F.3d 1226, 1231 (9th Cir. 2002) (O'Scannlain, J., dissenting from denial of reh'g en banc) ("How could a State waive that which has already been

abrogated by Congress?").  Adhering to the stringent waiver standard articulated by the Supreme Court in College Savings Bank, I conclude that Nebraska did not knowingly relinquish its sovereign immunity to suit under § 504 by accepting federal funds for its adoption and foster care programs.

Our en banc decision in Jim C. v. United States, 235 F.3d 1079 (8th Cir. 2000) (en banc), cert. denied, 533 U.S. 949 (2001), does not foreclose consideration of whether Nebraska knowingly waived its right to sovereign immunity from suit for § 504 claims by accepting Rehabilitation Act funds because the issue was never raised in that case.  We simply considered whether § 504 was a valid exercise of Congress's spending power and whether Arkansas waived its sovereign immunity to suit under § 504 by accepting federal funds.  Id. at 1080.  We did not address, nor have we ever addressed, the precise issue before us now: whether the state made a *knowing* waiver.

Finally, I do not believe the Court's reliance on "established principles of contract law" is well-founded.  Ante at 15.  Indeed, the Court cites no authority for its application of contract law to this case.  We are dealing here not merely with a "contract," if that is even a correct way to view the statutory abrogation-plus-waiver-equals-receipt-of-federal-funds arrangement at issue in this case.  Instead, we are dealing with a sovereign state, its relationship to the federal government (a subject on which the Constitution has a great deal to say), and what must be shown to establish that the state, as a matter of constitutional law, has knowingly waived its Eleventh Amendment immunity.  Under the standards of College Savings Bank and its declared presumption against such waivers, the requisite showing has not been made.

Regarding the Court's speculations as to the federal government's remedy in the event a knowing waiver is not found, i.e., could the government recover the funds it advanced to Nebraska, I simply note that this is not an issue raised or briefed in the

present appeal. Unless and until the government were to assert a claim to get some or all of the money back, it could not become an issue that would reach our Court. Such a claim would necessarily raise novel and complex issues. It is best left for another day, if such a day were ever to come. Meanwhile, speculation concerning whether Nebraska would have accepted the Rehabilitation Act funds, had it known that its sovereign immunity was not waived before it accepted the federal funds but would be waived when it took the money, is irrelevant to the legal question at issue.

For the reasons stated, the plaintiffs' claims brought under § 504 of the Rehabilitation Act should be barred.

_____